**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

No. 3:23-CV-546

| | |
|---|---|
| LUCAS ROUGEAU; ALISHA ROUGEAU; CARRIE BRENTON; KERRY BRENTON; TIMOTHY GERDMANN; AND MELISSA GERDMANN, <br><br> Plaintiffs, <br><br><br> vs. <br><br> 3M COMPANY (f/k/a MINNESOTA MINING AND MANUFACTURING, CO.); AHLSTROM RHINELANDER LLC; AHLSTROM-MUNKSJO SPECIALTY SOLUTIONS ACQUISITION LLC; AHLSTROM NA SPECIALTY SOLUTIONS LLC; AND JOHN DOE DEFENDANTS 1-49, <br><br> Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   **COMPLAINT**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Plaintiffs, by and through undersigned counsel, bring this action against Defendants 3M Company; Ahlstrom Rhinelander LLC, Ahlstrom-Munksjo Specialty Solutions Acquisition LLC, Ahlstrom NA Specialty Solutions LLC (collectively, "Ahlstrom"); and John Doe Defendants 1-49 (collectively, "Defendants"). Plaintiffs, based on information, belief, and investigation of Counsel, allege as follows:

# I.    SUMMARY OF THE CASE

1.    Plaintiffs own and live on properties serviced by private wells in and around Oneida County, Wisconsin. As a result of Defendants' actions, Plaintiffs' wells are now contaminated by per- and polyfluoroalkyl substances ("PFAS") including, but not limited to, perfluorooctanoic acid ("PFOA") and/or perfluorooctane sulfonic acid ("PFOS").   PFAS concentrations in Plaintiffs' private wells are among the highest in the country and have been found at levels that are thousands of times greater than EPA health limits.

2.    Over the course of decades, Defendant Ahlstrom and its predecessors disposed of millions of pounds of waste from the Rhinelander Paper Mill by dumping and spreading the waste on farmland throughout Oneida County, and specifically in the Town of Stella.   Upon information and belief, this waste contained high levels of PFOA, PFOS, and other PFAS.   It was this "land application" of waste that caused Plaintiffs' wells to be among the most contaminated in the country for PFAS.

3.    In addition to Defendant Ahlstrom – which owns and operates the Rhinelander Paper Mill – Plaintiffs also bring this action against Defendant 3M, which sold and supplied PFAS chemicals to the Ahlstrom facility.

4.    PFOA and PFOS both are known to be toxic, persistent in the environment, not biodegradable, move easily through soil and groundwater, and pose a significant risk to human health and safety. Both are animal carcinogens and likely human carcinogens. Indeed, the United States Environmental Protection Agency ("EPA") has stated that "human epidemiology data report associations between PFOA exposure and high cholesterol, increased liver enzymes, decreased vaccination response, thyroid disorders, pregnancy-induced hypertension and preeclampsia, and

cancer (testicular and kidney)" and that "there is suggestive evidence of carcinogenic potential for PFOS."1

5.      At all relevant times, upon information and belief, Defendant Ahlstrom and its predecessors knew or should have known about the inherent risks and dangers involved in applying PFAS-containing waste on farmlands. And at all relevant times, Defendant 3M knew or should have known about the inherent risks and dangers involved in the use of PFAS compounds in products sold to other companies, like Ahlstrom—including that both PFOA and PFOS are mobile in water, not easily biodegradable, highly persistent in the environment, and present significant and unreasonable risks to both human health and the environment. Nevertheless, Defendants made a conscious choice to manufacture, market, sell, and dispose of PFAS products and waste in a way that caused harm to Plaintiffs.

6.      Plaintiffs file this lawsuit to recover compensatory and all other damages, including but not limited to the costs of restoring and remediating contamination from their real properties and drinking water wells, costs of treating water, costs of acquiring bottled water, non-economic damages, loss of earnings and future earnings, damages for loss of use and enjoyment, lost property value, and household expenses, among others.

---

1 *See* U.S. Envtl. Protection Agency ("EPA"), Office of Water Health and Ecological Criteria Division, "Health Effects Support Document for Perfluorooctanoic Acid (PFOA)," EPA Document Number: 822-R-16-003, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfoa_hesd_final-plain.pdf (last accessed 11/22/2022); *see also* EPA, Office of Water Health and Ecological Criteria Division,
 "Health Effects Support Document for Perfluorooctane Sulfonate (PFOS)," EPA Document Number: 822-R-16- 002, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfos_hesd_final_508.pdf (last accessed 11/22/2022).

## II.    PARTIES

A.    <u>PLAINTIFFS</u>

7.    Plaintiffs Lucas & Alisha Rougeau own a home at 4176 Depot Road, Rhinelander, Wisconsin.   Plaintiff Lucas Rougeau also operates his business out of 4176 Depot Road, Rhinelander, Wisconsin.   A private water well on the property supplies water to the property. PFAS have been detected in the well at the Rougeau's property at the following levels: PFOA – 1660 ppt; PFOS – 142 ppt; PFNA – 9.57 ppt; PFHxS – 21.6 ppt; PFHxA – 207 ppt; PFBS – 2.16 ppt.

8.    Plaintiffs Carrie and Kerry Brenton live and own a home at 4181 Depot Road, Rhinelander, Wisconsin.   A private water well on the property supplies water to the property. PFAS have been detected in the well at the Brenton's property at the following levels: PFOA – 2020 ppt; PFOS – 156 ppt; PFNA – 8.47 ppt; PFHxS – 26.4 ppt; PFHxA – 185 ppt.

9.    Exposure to Defendants' PFAS has caused or was a substantial factor in causing high cholesterol in Plaintiffs Carrie and Kerry Brenton.   Mr. & Mrs. Brenton have incurred, and will incur, costs and expenses related to their injuries.

10.    Plaintiffs Timothy and Melissa Gerdmann live and own a home at 4187 Depot Road, Rhinelander, Wisconsin. A private water well on the property supplies water to the property. PFAS have been detected in the well at the Gerdmanns' property at the following levels: PFOA – 2,910 ppt; PFOS – 74 ppt; PFHxS – 45.9 ppt; PFHxA – 368 ppt.

11.    Exposure to Defendants' PFAS has caused high cholesterol in Timothy Gerdmann. Timothy Gerdmann has incurred, and will incur, costs and expenses related to his injuries.

4

12.     The Plaintiffs have a property interest in their residential property, its water well and associated piping, and in the water it appropriates for use.

**B.     DEFENDANTS**

13.     Defendants Ahlstrom Rhinelander LLC, Ahlstrom-Munksjo Specialty Solutions Acquisition LLC, and/or Ahlstrom NA Specialty Solutions LLC ("Ahlstrom") own and/or operate a facility at 515 West Davenport Street, Rhinelander, Wisconsin 54501.   This Complaint refers to this facility as the "Rhinelander Paper Mill."

14.     At the Rhinelander facility, Ahlstrom and its predecessors used PFAS products manufactured by 3M.

15.     Ahlstrom then improperly disposed of PFAS-containing waste by spreading tons of this waste on farms in the Rhinelander area.

16.     **3M:** Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 3M Center, St. Paul, Minnesota 55144. At all times relevant, 3M manufactured, marketed, promoted, distributed, and/or sold PFAS including PFOA and/or PFOS to Ahlstrom for use at the Rhinelander Paper Mill.

### III.     JURISDICTION & VENUE

17.     This Court has jurisdiction pursuant to 28 U.S.C. §1332 because complete diversity exists between the Plaintiffs and the Defendants. The Plaintiffs are located in Wisconsin, but no Defendant is a citizen of Wisconsin. Defendants are incorporated and maintain principal places of

business in locations other than Wisconsin, as outlined above. Plaintiffs' claims exceed the required amount in controversy.

18.     Venue is appropriate in this judicial district pursuant to 28 U.S.C. §1391(a) because a substantial part of the property that is the subject of the action is situated in this judicial district and division.

### IV.     FACTUAL ALLEGATIONS
### COMMON TO ALL PLAINTIFFS AND CLASS MEMBERS

**A.     THE PFAS CONTAMINANTS AT ISSUE: PFOA AND PFOS, AMONG OTHERS**

19.     Both PFOA and PFOS fall within a class of chemical compounds known as per- and polyfluoroalkyl substances ("PFAS").   PFAS are sometimes described as long-chain and short-chain compounds, depending on the number of carbon atoms contained in the carbon chain. PFOA and PFOS are considered long-chain PFAAs because they each have eight carbon atoms in their chains.

20.     PFOA and PFOS are stable, man-made chemicals.  They are highly water soluble, persistent in the environment and resistant to biologic, environmental, or photochemical degradation. Because these compounds are water soluble and do not readily adsorb to sediments or soil, they tend to stay in the water column and can be transported long distances.

21.     Both PFOA and PFOS are readily absorbed in animal and human tissues after oral exposure and accumulate in the serum, kidney, and liver. They have been found globally in

water, soil, and air as well as in human food supplies, breast milk, umbilical cord blood, and humanblood serum.2

22.     Moreover, PFOA and PFOS are persistent in the human body and resistant to metabolic degradation. A short-term exposure can result in a body burden that persists for years and can increase with additional exposures.3

23.     Notably, from the time these two compounds were first produced, information has since emerged showing negative health effects caused by exposure to PFOA and PFOS. According to the EPA, studies indicate that exposure of PFOA and PFOS over certain levels may result in a number of adverse impacts to human health.  4  5

24.     In June 2022, after evaluating over 400 studies published since 2016 and applying human health risk assessment approaches, tools, and models, EPA concluded that the new data

---

2 *See* Agency for Toxic Substances and Disease Registry, "Per- and Polyfluoroalkyl Substances and Your Health," available at https://www.atsdr.cdc.gov/pfas/health-effects/index.html (last accessed 11/22/2022).

3 *See* U.S. Envtl. Protection Agency ("EPA"), Office of Water Health and Ecological Criteria Division, "Health Effects Support Document for Perfluorooctanoic Acid (PFOA)," EPA Document Number: 822-R-16-003, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfoa_hesd_final-plain.pdf (last accessed 11/22/2022); *see also* EPA, Office of Water Health and Ecological Criteria Division,
 "Health Effects Support Document for Perfluorooctane Sulfonate (PFOS)," EPA Document Number: 822-R-16- 002, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfos_hesd_final_508.pdf (last accessed 11/22/2022).

4 *See* EPA, "Fact Sheet PFOA & PFOS Drinking Water Health Advisories," EPA Document Number: 800-F-16-003, available at https://www.epa.gov/sdwa/drinking-water-health-advisories-pfoa-and-pfos (last accessed 11/22/2022).

5 *See* EPA, "Health Effects Support Document for Perfluorooctane Sulfonate (PFOS)," Document Number: 822 R-16-002, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfos_hesd_final_508.pdf (last accessed 11/22/2022).

indicates that the levels of PFOA and/or PFOS exposure at which negative outcomes could occur are much lower than previously understood when the agency issued its 2016 HAs for PFOA and PFOS (70 parts per trillion or ppt).   In 2022, EPA announced new Interim Updates Health Advisory levels for PFOA of 0.004 ppt and 0.02 ppt for PFOS.6

25.     In March 2023, EPA proposed Maximum Contaminant Levels (MCL) for six PFAS in drinking water: PFOA, PFOS, PFHxS, PFNA, GenX, and PFBS.   For PFOA and PFOS, EPA established a MCL of 4 ppt.   For the other four compounds, EPA's MCL is based on a hazard index where all four compounds are considered together.   The maximum amount of each PFAS that could be allowed without exceeding the EPA MCL is as follows: GenX – 10 ppt; PFBS – 2000 ppt; PFNA – 10 ppt; PFHxS – 9 ppt.

26.     PFAS have been categorized as endocrine disruptors that interfere with the normal function of the endocrine system and the reproductive and biological processes associated with it.

27.     PFAS chemicals have also been characterized as immunotoxin due to their adverse effect on the human immune system. Children exposed prenatally to PFAS show deficient antibody responses.

### B.     DEFENDANTS' KNOWLEDGE AND CONCEALMENT OF PFOA/PFOS HAZARDS

28.     On information and belief, by the 1970s, Defendant 3M knew, or reasonably should have known, among other things, that: (1) PFOA and PFOS are toxic; and (2) upon entering the

---

6 EPA, "Technical Fact Sheet: Drinking Water Health Advisories for Four PFAS (PFOA, PFOS, GenX chemicals, and PFBS)," EPA Document Number 822-F-22-002, available at https://www.epa.gov/system/files/documents/2022-06/technical-factsheet-four-PFAS.pdf (last accessed June 30, 2022).

environment, PFOA and PFOS migrate through the subsurface, mix easily with groundwater, resist natural degradation, render drinking water unsafe and/or non-potable, and can be removed from property and drinking water supplies only at substantial expense.

29.     At all times pertinent herein, Defendants also knew or should have known that PFOA and PFOS present a risk to human health and could be absorbed into the lungs and gastrointestinal tract, potentially causing severe damage to the liver, kidneys, and central nervous system, in addition to other toxic effects, and that PFOA and PFOS are known carcinogens that cause genetic damage.

30.     For instance, in 1980, 3M published data in peer reviewed literature showing that humans retain PFOS in their bodies for years. Based on that data, 3M estimated that it could take a person up to 1.5 years to clear just half of the accumulated PFOS from their body after all exposures had ceased.[7]

31.     By the early 1980s, the industry suspected a correlation between PFOS exposure and human health effects. Specifically, manufacturers observed bioaccumulation of PFOS in workers' bodies and birth defects in children of workers.

32.     Beginning in 1983, 3M documented a trend of increasing levels of PFOS in the bodies of 3M workers. In an internal memo, 3M's medical officer warned: "[W]e must view this

---

7 *See* Envtl. Working Group ("EWG"), "New Data on Half Life of Perfluorochemicals in Serum," available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades (last accessed 11/22/2022) (in particular, please refer to the "Letter from 3M to Office of Pollution Prevention and Toxics," referenced in the article).

present trend with serious concern. It is certainly possible that [...] exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."8

33.     Notwithstanding their respective knowledge of the dangers involved with PFAS Products, 3M willfully, negligently and carelessly: (1) designed, manufactured, marketed, and/or sold PFAS Products containing PFOA and/or PFOS; (2) issued instructions on how PFAS Products should be used and disposed of, thus improperly permitting PFOA and/or PFOS to contaminate soil and groundwater; (3) failed to recall and/or warn users of PFAS Products of the dangers of soil and groundwater contamination as a result of the standard use and disposal of these products; and, (4) further failed and refused to issue the appropriate warnings and/or recalls to the users of PFAS Products, notwithstanding the fact that Defendants knew the identity of those users.

34.     The Rhinelander Paper Mill was established in approximately 1903. It was acquired or through merger and acquisition became Wausau Paper in approximately 1997. It was acquired or through merger and acquisition became Experience Specialty Solutions in approximately 2013. .It was finally acquired or through merger and acquisition became Ahlstrom in approximately 2018. Through these names changes, mergers and/or acquisitions there was an identity of ownership which remained the same.

35.     For decades until the present, Ahlstrom and its predecessors delivered and applied PFAS-laden waste sludge to landowners in the area.  As reflected in Annual Land Application Reports, Ahlstrom spread millions of pounds of this waste sludge over thousands of acres of farmland. Upon information and belief, Ahlstrom did not warn the property owners of the dangers

---

8 *See id.* (in particular, please refer to the "Organic Fluorine Levels" Memorandum referenced in the article).

associated with PFAS applied to their properties, nor did they warn landowners in communities that could be affected by their waste application.

36.     Upon information and belief, Ahlstrom and its predecessors knew or should have long known of the dangers associated with PFAS in products made and used at the Rhinelander Paper Mill and knew that disposal of PFAS-containing waste on farmlands could lead to groundwater contamination.

37.     Upon information and belief, at no point did Ahlstrom or its predecessors advise the owners of land upon which Rhinelander Paper Mill waste was applied that the Mill's waste may contain dangerous PFAS, including PFOA or PFOS.

38.     Ahlstrom and its predecessors operated, owned, and/or had responsibility for the Rhinelander Paper Mill during time periods relevant to Plaintiffs' claims. Ahlstrom and its predecessors maintained the same employees, products, and facilities through the various mergers, acquisitions and/or name changes. Ahlstrom merged with, acquired, and/or created other businesses by merger, acquisition, name change, and/or otherwise expressly and impliedly agreed and/or assumed obligations and liability under applicable contracts, and had a duty to remedy the past wrongs of those parties for whose fault or obligations they are legally responsible.   To the extent that Ahlstrom acquired the business or assets of a predecessor without a formal merger, Ahlstrom is liable under the de facto merger and mere continuation doctrines of Wisconsin law.

39.     As a direct result of Defendants' acts alleged in this Complaint, Plaintiffs' Properties have been contaminated, and will continue to be contaminated, with PFOA and PFOS. This has created an environmental and public health hazard until such contamination may be remediated.   As a direct and proximate result, Plaintiffs must assess, evaluate, investigate,

monitor, remove, clean up, correct, and remediate PFAS contamination from their properties at significant expense, loss, and damage to Plaintiffs.

40.    Defendants had a duty to evaluate and test such products adequately and thoroughly to determine their environmental fate and transport characteristics and potential human health and environmental impacts before they sold such products, but they breached this duty. Defendants moreover breached their duty to minimize the environmental harm caused by PFOA and PFOS. Moreover, Defendants failed to warn Plaintiffs of the known risks for environmental and health hazards arising from the usage of Defendants' PFAS in their intended manner for its intended purpose.

## C.   THE IMPACT OF PFOA AND PFOS ON PLAINTIFFS AND CLASS MEMBERS

41.    As discussed above, Plaintiffs own real properties and private drinking water wells contaminated with PFOA and PFOS.   Plaintiffs have been regularly exposed to dangerously high levels PFOS and PFOA compounds.

42.    The detection and/or presence of PFOA and PFOS, and the threat of further detection and/or presence of PFOA and PFOS, on Plaintiffs' Properties has resulted, and will continue to result, in significant injury and damage to Plaintiffs.

43.    The invasion of Plaintiffs' Properties with PFOA and PFOS is continuous and recurring, as new contamination flows regularly and constantly into Plaintiffs' Properties each day—the result of which is a new harm to each Plaintiff and its property in each and every occurrence.

44.     The injuries to Plaintiffs caused by Defendants' conduct constitute an unreasonable interference with, and damage to, the limited subterranean and surficial supplies of fresh drinking water on which Plaintiffs' wells depend.

45.     Plaintiffs' exposure to PFOA and PFOS has occurred, and continues to occur, on a daily basis.   This repeated exposure has caused Plaintiffs considerable fear and concern.

46.     Through this action, Plaintiffs seek to recover damages (including but not limited to compensatory, punitive, and/or consequential damages) arising from both personal injury to certain Plaintiffs and the continuous and ongoing contamination of all Plaintiffs' Properties by Defendants' PFAS.   Such damages moreover include, but are not limited to, the past and future costs of restoring and remediating contamination from their real properties and drinking water wells, past and future medical expenses (for those alleging personal injuries), loss of earnings, and household expenses, among others.

## CLASS ACTION ALLEGATIONS

47.     Plaintiffs and Class Members have all suffered injury in fact as a result of the presence of PFAS in the drinking water supplied to the Plaintiffs' properties as a result of Defendants' unlawful conduct.

48.     Plaintiffs bring this lawsuit on behalf of themselves and all other individuals that are similarly situated.

49.     The proposed Class Definition is "all owners of real property in Oneida County where PFOA or PFOS has been detected in well water and such contamination was caused by the land application of PFAS-containing waste from the Rhinelander Paper Mill."

50.     Excluded from the putative class are Defendants and their officers and directors. Plaintiffs reserve the right to modify or amend the Class Definition before the Court determines whether certification is appropriate.

51.     Ascertainability. The members of the Class are readily ascertainable by reference to public property records, land application records, water testing records, and Plaintiffs' personal and employment records.

52.     Numerosity. The members of the Class are so numerous that their individual joinder is impracticable.   Upon information and belief, there are over 100 putative Class Members.

53.     Existence and predominance of Common Questions of Law and Fact.   Common questions of law and fact that exist as to all members of the Class predominate over any questions affecting only individual class members. All members of the Class have been subject to the same conduct and suffer injuries as a result. Questions of law or fact which are common to the Class, as set forth in this Complaint, predominate over questions affecting individual members because class members are similarly situated victims of Defendants' common course of conduct.   Defendants' conduct similarly harmed all Class Members because Defendants designed, manufactured, promoted, sold, and disposed of PFAS in a way that led to the contamination of Plaintiffs' properties. In addition, Defendants have no defenses specific to individual Class Members, and Defendants' defenses, if any, apply equally to all Class Members.   The common legal and factual questions include, but are not limited to, the following:

    a.   whether PFAS are unreasonably dangerous;

    b.   whether PFAS applied to land as waste contaminate nearby properties and private wells;

14

c. whether Defendants could have reasonably foreseen that PFAS, when used and disposed of as intended, would contaminate nearby properties and private wells;

d. whether Defendants could have reasonably foreseen that PFAS, when used as intended or disposed of as reasonably foreseen, would cause injurious exposure to individuals who own, reside, work, and visit those properties and/or consume or use water supplied by private wells on those properties;

e. whether the presence of PFAS on properties and in private wells constitutes trespass or nuisance;

f. whether Defendants owed Plaintiffs and Class Members a duty to ensure that their PFAS, when used and disposed of as intended, did not contaminate properties and private wells;

g. whether Defendants owed Plaintiffs and Class Members a duty to warn about hazards associated with PFAS when used and disposed of as intended or reasonably foreseen;

h. whether Defendants owed Plaintiffs and Class Members a duty to warn about PFAS Products' propensity to expose individuals to PFAS through contamination of properties and private wells;

i. whether Defendants breached their duties;

j. whether Defendants' actions directly and proximately caused Plaintiffs' and Class Members' injuries and damages;

k. whether Defendants' conduct supports an award of punitive damages.

54.     Typicality. Plaintiffs' claims are typical of the claims of the members of the Class in that Plaintiffs are members of the Class that Plaintiffs seek to represent. Plaintiffs own properties contaminated with PFOA and PFOS and other PFAS compounds from the Rhinelander Paper Mill.

55.     Adequacy of Representation. Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel experienced in litigating environmental torts, products liability, personal injury, and class actions. Plaintiffs have no adverse or antagonistic interests to those in the Class and will fairly and adequately protect the interests of the Class.   Plaintiffs' attorneys are aware of no interests adverse or antagonistic to those of the Plaintiffs and proposed Class.

56.     Superiority. A class action is superior to any other theoretically available method for the fair and efficient adjudication of this controversy. Significant economies of time, effort, and expense will inure to the benefit of the Court and the parties in litigation of essentially identical issues on a class-wide rather than a repetitive individual basis. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system and the issues raised by this action. The damages or other financial detriment suffered by individual Class members may be relatively small compared to the burden and expense that would be entailed by individual litigation of the claims against the Defendants. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. No unusual difficulties are likely to be encountered in the management of this class action, and concentrating the litigation in a single forum is particularly convenient to the parties.

## VI.   FIRST CAUSE OF ACTION
## Strict Liability - Design Defect and/or Defective Product

## (against 3M & John Doe Defendants)

57.     Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

58.     As a manufacturer, designer, formulator, distributor, supplier, seller, and marketer of products containing PFAS, including PFOA and PFOS, Defendants owed a duty to all persons whom its PFAS Products might foreseeably harm, not to market and sell any product which poses an unreasonable risk of injury from its intended and foreseeable uses.

59.     Defendants designed, manufactured, formulated, promoted, marketed, distributed, exchanged and/or sold PFAS products.

60.     Defendants designed, manufactured, formulated, set specifications for, exchanged, promoted, marketed and/or otherwise supplied (directly or indirectly) PFAS Products that were used at the Rhinelander Paper Mill and ultimately contaminated Plaintiffs' property.

61.     At all relevant times, the foreseeable risks of harm posed by Defendants' products could have been reduced or avoided by the adoption of a reasonable alternative design by the manufacturer, and the omission of the alternative design rendered the products not reasonably safe.

62.     Defendants represented, asserted, claimed, and warranted that PFAS Products did not require any special handling or precautions with respect to disposal to prevent PFAS contamination of property and human exposure.

63.     Defendants knew or reasonably should have known that PFAS Products were to be purchased and used by Ahlstrom without inspection for defects.

64.     When Defendants placed PFAS Products into the stream of commerce, they were defective, unreasonably dangerous, and not reasonably suited for intended, foreseeable and ordinary transportation, storage, handling, and uses for the following reasons, among others:

    a.   PFAS compounds have a tendency to mix with groundwater and migrate great distances;

    b.   PFAS compounds readily escape from PFAS Products and have a tendency to mix with nearby waste;

    c.   unintended discharges of PFAS from PFAS products are commonplace;

    d.   PFAS Products cause extensive groundwater contamination when used and disposed of in a foreseeable and intended manner;

    e.   PFAS compounds persist in the environment and resist biodegradation;

    f.   certain PFAS compounds biodegrade to PFOA and PFOS;

    g.   even at extremely low levels, PFOA and PFOS render drinking water unsuitable for human consumption and use;

    h.   PFOA and PFOS pose significant threats to the public health and welfare and the environment;

    i.   PFOA and PFOS are associated with serious human health risks including the risk of cancers;

    j.   Defendants failed to conduct reasonable, appropriate, or adequate scientific studies to evaluate the environmental fate and transport and potential human health effects of PFOA and PFOS before marketing PFAS Products

    k.  at all times relevant to this action, feasible alternatives that would have eliminated the unreasonable danger posed by PFOA and PFOS, without excessive costs or loss of product efficiency, were available.

65.    The defective conditions existed at the time the product left the control of the manufacturer, the product reached the user without substantial change in the condition in which it was sold, and the defective condition ultimately caused Plaintiffs' damages.

66.    Upon information and belief, Defendants specifically represented that their PFAS products had significant periods of useful life, spanning beyond 15 years.

67.    At all times relevant to this action, PFAS Products were dangerous to an extent beyond that which would be contemplated by the ordinary consumer, and/or the risk of harm to public health and welfare and the environment posed by PFAS Products outweighed the cost to defendant of reducing or eliminating such risk.

68.    At all times relevant to this action, PFAS Products were used in a manner in which they were foreseeably intended to be used and without substantial change in their condition, and as a proximate result of the defects previously described, PFAS proximately caused Plaintiffs to sustain the injuries and damages set forth in this Complaint.

69.    As a direct and proximate result of defendants' acts and omissions as alleged in this Complaint:

    a.    Plaintiffs' water supplies were and continue to be contaminated with PFOA, PFOS, and other PFAS compounds;

    b.    Plaintiffs were exposed to hazardous chemical substances through their ordinary use of contaminated water for drinking, cooking, bathing, and cleaning; and

     c.     Plaintiffs' properties were and continue to be contaminated such that they have incurred, are incurring, and will incur, substantial costs for investigation, remediation, cleanup, restoration, removal, treatment, and monitoring. Additionally, Plaintiffs may be forced to incur substantial costs to connect their homes to a municipal water supply, and they would then face monthly charges and bills for water use.

70.     As a further direct and proximate result of the acts and omissions of the defendants alleged in this Complaint, Plaintiffs have sustained and will sustain other substantial expenses and damages, in an amount within the jurisdictional limits of this Court, for which defendants are strictly, jointly and severally liable.

71.     The injuries to Plaintiffs caused and/or threatened by defendants' acts and omissions as alleged in this Complaint are indivisible.

72.     3M knew that it was substantially certain that the acts and omissions described above would threaten public health and cause extensive contamination of property and drinking water supplies. 3M committed each of the above-described acts and omissions maliciously, fraudulently, willfully and/or wantonly, with conscious disregard for probable injury, or with gross negligence or oppressiveness. Such conduct was not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing.

73.     3M's conduct is reprehensible, despicable, and was performed to promote sales of PFAS Products in conscious and/or reckless disregard of the known risks of injury to health and property. 3M acted with conscious, willful, and wanton disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon Plaintiffs. Therefore, Plaintiffs

request an award of exemplary and punitive damages in an amount reasonable, appropriate, and sufficient to punish this Defendant and deter it from ever committing the same or similar acts.

## VII.   SECOND CAUSE OF ACTION
### Strict Liability - Failure to Warn / Inadequate Instructions or Warnings
### (against 3M and John Doe Defendants)

74.     Plaintiffs reallege and reaffirm the allegations set forth in all preceding paragraphs.

75.     Defendants designed, manufactured, formulated, promoted, marketed, distributed, exchanged and/or sold PFAS Products to commercial users including Ahlstrom.

76.     Defendants designed, manufactured, formulated, set specifications for, exchanged, promoted, marketed and/or otherwise supplied (directly or indirectly) PFAS Products that were delivered to Ahlstrom and onto Plaintiffs' properties.

77.     Defendants represented, asserted, claimed, and warranted that PFAS Products could be used without special handling or precautions.

78.     PFAS Products are defective and unreasonably dangerous products for the reasons set forth in paragraphs above.

79.     Defendants knew, or reasonably should have known, of the foreseeable risks and defects of PFAS Products.  Defendants nonetheless failed to provide adequate warnings of the known and foreseeable risks of PFAS Products, including contamination of properties and water supplies with PFOA and PFOS. And Defendants failed to provide adequate instructions regarding the use and disposal of its PFAS products to prevent contamination of properties and water supplies with PFOA and PFOS.

80.     The harm posed by Defendants' PFAS products could have been reduced or avoided by the provision of reasonable instructions or warnings by Defendants to its customers and the omission of the instructions or warnings rendered their PFAS Products not reasonably safe.

81.     Defendants knew, or reasonably should have known, that its customers would use and dispose of PFAS products in a way that could lead to contamination of water supplies.

82.     Defendants knew, or reasonably should have known, that its PFAS products could contaminate water supplies like Plaintiffs'. At no point did 3M warn Plaintiffs.

83.     Defendants' PFAS Products were used in a manner in which they were foreseeably intended to be used, and as a proximate result of Defendants' failure to warn of the risks of PFAS Products, PFAS compounds, including PFOA and PFOS, contaminate and threatens Plaintiffs' properties, causing Plaintiffs to sustain the injuries and damages set forth in this Complaint.

84.     As a direct and proximate result of defendants' acts and omissions as alleged in this Complaint:

> a.  Plaintiffs' water supplies were and continue to be contaminated with PFOA and PFOS;
>
> b.  Plaintiffs were exposed to hazardous chemical substances through their ordinary use of contaminated water for drinking, cooking, bathing, and cleaning;
>
> c.  Plaintiffs' properties were and continue to be contaminated such that they have incurred, are incurring, and will incur, substantial costs for investigation, remediation, cleanup, restoration, removal, treatment, and monitoring.

22

d. Additionally, Plaintiffs may be forced to incur substantial costs to connect their homes to a municipal water supply, in which case they would face monthly charges and bills for water use;

85. As a further direct and proximate result of the acts and omissions of Defendants as alleged in this Complaint, Plaintiffs have sustained and will sustain other substantial expenses and damages, in an amount within the jurisdictional limits of this Court, for which defendants are strictly, jointly and severally liable.

86. The injuries to Plaintiffs caused and/or threatened by defendants' acts and omissions as alleged in this Complaint are indivisible.

87. Defendants knew that it was substantially certain that the acts and omissions described above would threaten public health and cause extensive contamination of property and drinking water supplies. Defendants committed each of the above described acts and omissions maliciously, fraudulently, willfully and/or wantonly, with conscious disregard for probable injury, or with gross negligence or oppressiveness. Such conduct was not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing.

88. Defendants' conduct is reprehensible, despicable, and was performed to promote sales of PFAS Products in conscious and/or reckless disregard of the known risks of injury to health and property. Defendants acted with conscious, willful, and wanton disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon Plaintiffs. Therefore, Plaintiffs request an award of exemplary and punitive damages in an amount reasonable, appropriate, and sufficient to punish these Defendants and deter them from ever committing the same or similar acts.

## VIII.   THIRD CAUSE OF ACTION
### Negligence
### (ALL DEFENDANTS)

89.     Plaintiffs reallege and reaffirm the allegations set forth in all preceding paragraphs.

90.     Defendants had a duty to exercise due care in the design, manufacture, formulation, handling, control, disposal, promotion, marketing, distribution, sale, testing, labeling, use, provision of product information, and instructions for use of PFAS Products and PFAS-containing waste.

91.     Defendants so negligently, carelessly, and recklessly designed, manufactured, formulated, handled, labeled, provided product information and/or instructions for use of, controlled (or failed to control), tested (or failed to test), marketed, promoted, sold, supplied, used, and/or disposed of PFAS Products and/or PFAS-containing waste that they breached their duties and directly and proximately caused PFAS to contaminate Plaintiffs' properties and threaten Plaintiffs' health, resulting in the damages alleged in this Complaint.

92.     Defendants failed to conduct reasonable, appropriate or adequate scientific studies to evaluate the environmental fate and transport characteristics of PFAS Products, PFAS-waste, and PFAS compounds, including the likelihood that use and disposal of PFAS Products and PFAS waste would cause PFOA, PFOS, and other PFAS to contaminate properties and water supplies, render drinking water unusable and unsafe, and threaten public health and welfare and the environment.

93.     3M manufactured, promoted, marketed, supplied and/or otherwise placed into the stream of commerce PFAS Products when it knew, or reasonably should have known, that: (a) commercial customers would use PFAS Products without understanding of their properties, (b)

such customers would handle, store, use, or dispose of PFAS Products or waste containing PFAS; (c) such use and/or misuse would release PFAS compounds including PFOA and PFOS into the environment; and (d) when released into the environment, PFOA and PFOS would migrate into water, resist biodegradation, contaminate groundwater, including drinking water supplies, and, ultimately, be difficult and costly to find and remove from the water.

94.     3M sold PFAS Products to the Rhinelander Paper Mill when it knew, or reasonably should have known, that: (a) use of such products would release PFOA and PFOS; (b) Ahlstrom and its predecessors disposed of PFAS-laden waste sludge from the Rhinelander Paper Mill by spreading it onto farmland; (c) when waste sludge is applied to farmland, PFOA and PFOS would migrate into soils and waters, resist biodegradation, contaminate groundwater, including drinking water supplies, and, ultimately, be difficult and costly to remove from the water; and (d) contaminate the farms and nearby properties, causing human exposure and resulting health risks.

95.     Ahlstrom intentionally and unreasonably disposed of PFAS-laden waste sludge from its Rhinelander Plant by spreading it onto nearby farmland when it knew, or reasonably should have known, that such application would contaminate those farmlands with PFOA and PFOS, contaminate groundwater and private drinking water supplies with PFOA and PFOS, and expose humans to PFOA and PFOS. In the alternative, 3M willfully and intentionally withheld information from Ahlstrom material to Ahlstrom's decision to dispose of PFAS-laden waste sludge from its Rhinelander Plant by spreading it onto nearby farmland.

96.     Neither 3M nor Ahlstrom provided any warnings regarding the potential for property and water contamination with PFAS, including PFOA and PFOS.  Nor did 3M or Ahlstrom take any precautionary measures to prevent or mitigate such contamination.

97.     In light of the facts alleged in this Complaint, Defendants, and each of them, breached their duty to use due care in the design, manufacture, formulation, handling, control, marketing, promotion, distribution, sale, testing, labeling, use, disposal, and provision of product information and/or instructions for use of PFAS Products and/or PFAS waste streams generated by the use of PFAS Products.

98.     As a direct and proximate result of defendants' acts and omissions as alleged in this Complaint:

> a.  Plaintiffs' water supplies were and continue to be contaminated with PFAS compounds, including PFOA and PFOS;
>
> b.  Plaintiffs were exposed to hazardous chemical substances through their ordinary use of contaminated water for drinking, cooking, bathing, and cleaning;
>
> c.  Plaintiffs' properties were and continue to be contaminated such that they have incurred, are incurring, and will incur, substantial costs for investigation, remediation, cleanup, restoration, removal, treatment, and monitoring;
>
> d.  Additionally, Plaintiffs may have to be forced to incur substantial costs to connect their homes to a municipal water supply, in which case they would face monthly charges and bills for water use;

99.     As a further direct and proximate result of the acts and omissions of the Defendants alleged in this Complaint, Plaintiffs have sustained and will sustain other substantial expenses and

damages, in an amount within the jurisdictional limits of this Court, for which defendants are strictly, jointly and severally liable.

100.    The injuries to Plaintiffs caused and/or threatened by defendants' acts and omissions as alleged in this Complaint are indivisible.

101.    Defendants knew that it was substantially certain that the acts and omissions described above would threaten public health and cause extensive contamination of property and drinking water supplies.   Defendants committed each of the above described acts and omissions maliciously, fraudulently, willfully and/or wantonly, with conscious disregard for probable injury, or with gross negligence or oppressiveness.   Such conduct was not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing.

102.    Defendants' conduct is reprehensible, despicable, and was performed to promote sales of PFAS Products, and the disposal of waste streams from use of those products, in conscious and/or reckless disregard of the known risks of injury to health and property.   Defendants acted with conscious, willful, and wanton disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon Plaintiffs.   Therefore, Plaintiffs request an award of exemplary and punitive damages in an amount reasonable, appropriate, and sufficient to punish these Defendants and deter them from ever committing the same or similar acts.

## IX.   FOURTH CAUSE OF ACTION
### Private Nuisance
### (All Defendants)

103.    Plaintiffs reallege and reaffirm the allegations set forth in all preceding paragraphs.

104.    Plaintiffs' properties and wells have been and remain contaminated by PFOA and PFOS as a direct and proximate result of the intentional and unreasonable, negligent, and reckless

conduct of Defendants, all as alleged in this Complaint.   Such contamination is a substantial and unreasonable interference with Plaintiffs' use of property, land, water, and wells.

105.    As a direct and proximate result of defendants' acts and omissions as alleged in this Complaint:

      a. Plaintiffs' water supplies were and continue to be contaminated with PFAS, including PFOA and PFOS;

      b. Plaintiffs were exposed to hazardous chemical substances through their ordinary use of contaminated water for drinking, cooking, bathing, and cleaning;

      c. Plaintiffs' properties were and continue to be contaminated such that they have incurred, are incurring, and will incur, substantial costs for investigation, remediation, cleanup, restoration, removal, treatment, and monitoring.

      d. Plaintiffs have lost considerable use and enjoyment of their property. Plaintiffs cannot garden, drink water from their tap, bathe or recreate in water without fear, cook with water from their tap, among other things.

106.    As a further direct and proximate result of the acts and omissions of the defendants alleged in this Complaint, Plaintiffs have sustained and will sustain other substantial expenses and damages, in an amount within the jurisdictional limits of this Court, for which defendants are strictly, jointly and severally liable.

107.    The injuries to Plaintiffs caused and/or threatened by defendants' acts and omissions as alleged in this Complaint are indivisible.

108.    Defendants knew that it was substantially certain that the acts and omissions described above would threaten public health and cause extensive contamination of property and drinking water supplies.   Defendants committed each of the above described acts and omissions maliciously, fraudulently, willfully and/or wantonly, with conscious disregard for probable injury, or with gross negligence or oppressiveness.   Such conduct was not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing.

109.    Defendants' conduct is reprehensible, despicable, and was performed to promote sales of PFAS Products in conscious and/or reckless disregard of the known risks of injury to health and property.   Defendants acted with conscious, willful, and wanton disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon Plaintiffs. Therefore, Plaintiffs request an award of exemplary and punitive damages in an amount reasonable, appropriate, and sufficient to punish these Defendants and deter them from ever committing the same or similar acts.

## X.   FIFTH CAUSE OF ACTION
### Trespass
### (All Defendants)

110.    Plaintiffs reallege and reaffirm the allegations set forth in all preceding paragraphs.

111.    Defendants, their agents and employees, knew, or in the exercise of reasonable care should have known, among other things, that:   (a) PFAS Products and PFAS compounds are extremely hazardous to property, groundwater, and private water wells;   (b) PFAS compounds including PFOA and PFOS would readily escape from PFAS Products and PFAS-containing waste whenever those products are used, handled, stored, or disposed of (including through disposal of

PFAS-waste on farmland);   (c) once released into the environment, PFOA and PFOS would migrate readily into groundwater and would contaminate drinking water sources and wells.

112.   Defendants so negligently, recklessly and/or intentionally released, spilled, and/or failed to properly control, handle, store, contain, and use PFAS Products, and/or clean-up spills and leaks of PFAS Products, and/or improperly disposed of waste sludges from use of PFAS Products, that they directly and proximately caused and continue to cause PFAS compounds including PFOA and PFOS to intrude into and contaminate Plaintiffs' properties, water supplies, and wells.   Such an intrusion constitutes a trespass.

113.   As a direct and proximate result of defendants' acts and omissions as alleged in this Complaint:

  a. Plaintiffs' water supplies were and continue to be contaminated with PFAS, including PFOA and PFOS;

  b. Plaintiffs were exposed to hazardous chemical substances through their ordinary use of contaminated water for drinking, cooking, bathing, and cleaning;

  c. Plaintiffs' properties were and continue to be contaminated such that they have incurred, are incurring, and will incur, substantial costs for investigation, remediation, cleanup, restoration, removal, treatment, and monitoring.

114.   As a further direct and proximate result of the acts and omissions of the defendants alleged in this Complaint, Plaintiffs have sustained and will sustain other substantial expenses and

damages, in an amount within the jurisdictional limits of this Court, for which defendants are strictly, jointly and severally liable.

115.    The injuries to Plaintiffs caused and/or threatened by defendants' acts and omissions as alleged in this Complaint are indivisible.

116.    Defendants knew that it was substantially certain that the acts and omissions described above would threaten public health and cause extensive contamination of property and drinking water supplies.   Defendants committed each of the above-described acts and omissions maliciously, fraudulently, willfully and/or wantonly, with conscious disregard for probable injury, or with gross negligence or oppressiveness.   Such conduct was not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing.

117.    Defendants' conduct is reprehensible, despicable, and was performed to promote sales of PFAS Products in conscious and/or reckless disregard of the known risks of injury to health and property.   Defendants acted with conscious, willful, and wanton disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon Plaintiffs. Therefore, Plaintiffs request an award of exemplary and punitive damages in an amount reasonable, appropriate, and sufficient to punish these Defendants and deter them from ever committing the same or similar acts.

## XI. SIXTH CAUSE OF ACTION
### Strict Liability – Abnormally Dangerous
#### (Ahlstrom Defendants)

118.    Plaintiffs reallege and reaffirm the allegations set forth in all preceding paragraphs.

119.    The dangers and hazards of PFAS Products and PFAS are well documented: (a) Land application of PFAS-containing products and waste is extremely hazardous and present a

high degree of risk to property, groundwater, private water wells, and the health of those served by private water wells near the site of land application; (b) PFAS compounds – including PFOA and PFOS – readily escape from PFAS Products and PFAS-containing waste whenever disposed of on farmland through land application; and (c) once released into the environment, PFOA and PFOS migrate readily into groundwater and would contaminate drinking water sources and wells.

120.    Ahlstrom disposed of PFAS through land application, which presented extraordinary risks to the environment due to their persistence, bioaccumulate properties, toxicity, and ability to move in their environment. Accordingly, the risks of use grossly exceed their utility. 3M phased out the production of PFOS in approximately 2002 and will exit all PFAS manufacturing by the end of 2025: Additionally, 3M will discontinue manufacturing all fluoropolymers, fluorinated fluids, and PFAS-based additive products. Ahlstrom plans to completely phase out PFAS use by the end of 2023. As of November 2016, long-chain PFAS are no longer used in food contact applications sold in the United States.

121.    Land application of PFAS (including through disposal of PFAS-waste on farmland) was inappropriate for any location where there was a potential pathway to groundwater that could be used for domestic purposes, such as existed near the Plaintiffs' properties. The use of PFAS products near water resources creates an expectancy that PFAS will enter the groundwater and accumulate and pollute the groundwater with PFAS.

122.    The risks of land application of PFAS (including through disposal of PFAS-waste on farmland) cannot be acceptably mitigated or eliminated where there is a potential pathway of PFAS to groundwater, such as existed near the Plaintiff's properties.

123.     Spreading solids and waste containing high levels of PFOA, PFOS, and other PFAS on farmland near residential drinking water sources is not a common practice and is not in common usage.

124.     As a direct and proximate result of defendants' acts and omissions as alleged in this Complaint:

     a.  Plaintiffs' water supplies were and continue to be contaminated with PFAS, including PFOA and PFOS;

     b.  Plaintiffs were exposed to hazardous chemical substances through their ordinary use of contaminated water for drinking, cooking, bathing, and cleaning;

     c.  Plaintiffs' properties were and continue to be contaminated such that they have incurred, are incurring, and will incur, substantial costs for investigation, remediation, cleanup, restoration, removal, treatment, and monitoring.

125.     As a further direct and proximate result of the acts and omissions of the Defendants alleged in this Complaint, Plaintiffs have sustained and will sustain other substantial expenses and damages, in an amount within the jurisdictional limits of this Court, for which defendants are strictly, jointly and severally liable.

126.     The injuries to Plaintiffs caused and/or threatened by defendants' acts and omissions as alleged in this Complaint are indivisible.

127.     Defendants knew that it was substantially certain that the acts and omissions described above would threaten public health and cause extensive contamination of property and

drinking water supplies.   Defendants committed each of the above-described acts and omissions maliciously, fraudulently, willfully and/or wantonly, with conscious disregard for probable injury, or with gross negligence or oppressiveness.   Such conduct was not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing.

128.   Defendants' conduct is reprehensible, despicable, and was performed to promote sales of PFAS Products in conscious and/or reckless disregard of the known risks of injury to health and property.   Defendants acted with conscious, willful, and wanton disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon Plaintiffs. Therefore, Plaintiffs request an award of exemplary and punitive damages in an amount reasonable, appropriate, and sufficient to punish these Defendants and deter them from ever committing the same or similar acts.

## **PRAYER FOR RELIEF**

Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court grant Plaintiff and each Class Member the following relief against Defendants, jointly and severally, as follows:

a. Certify the Class as requested;

b. Appoint Plaintiffs to serve as the Class Representatives;

c. Appoint Scott Summy, Brett Land, Philip F. Cossich, Jr. and Andrew Cvitanovic as Lead Class Counsel;

d. Enter judgment for Plaintiffs and against Defendants for compensatory and punitive damages, all costs and expenses of suit, and pre- and post-judgment interest;

34

e.      Order such injunctive and equitable relief as necessary to abate the nuisance

caused by Defendants and to prevent continuing injury and damages to Plaintiffs;

f.      Order any further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury.

Dated: August 9, 2023

*Electronically signed:   Kristen E. Lonergan*
Kristen E. Lonergan (WI Bar 1077538)
**CROOKS LAW FIRM S.C.**
531 Washington Street
P.O. Box 1184
Wausau, Wisconsin 54402-1184
Telephone: (715) 842-2291
Fax: (715) 845-7367

**BARON & BUDD, P.C.**
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219-4281
Telephone: (214) 521-3605
Fax: (214) 520-1181
Scott Summy (TX Bar 19507500)
Brett Land (TX Bar 24092664)

**COSSICH, SUMICH, PARSIOLA
& TAYLOR, LLC**
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Telephone: (504) 394-9000
Fax: (504) 394-9110
Philip F. Cossich, Jr. (LA Bar 1788)
Andrew Cvitanovic (LA Bar 34500)

*Attorneys for Plaintiff*

35