**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

No. 3:23-CV-546

LUCAS ROUGEAU, ALISHA ROUGEAU, CARRIE BRENTON, KERRY BRENTON, TIMOTHY GERDMANN, MELISSA GERDMANN, DAVID GORMAN, ROBIN GORMAN, DAVID GRANDT, KATHI GRANDT, JUSTIN HETZEL, ERIN HETZEL, PHILIP IANNARELLI, MINNIE RAE IANNARELLI, GREG CANNER, SYLVIA CANNER, DON ENDRES, SARAH ENDRES, JASON DEBAY, SHARON LOMBARDI and MARTIN LOMBARDI, INDIVIDUALLY AND ON BEHALF OF MARTIN A. LOMBARDI AND SHARON M. LOMBARDI REVOCABLE TRUST, DIANE PILAT, EDWARD SZYMANSKI, NANCY SZYMANSKI, DENISE TERBEEST, ROBERT TERBEEST, DAVID MARTIN, REBECCA MARTIN, STEVEN WAKELY, MP SNOWDEN LLC, PATTI CRUMP, MICHAEL CRUMP, NICOLE PAULSON, JOHN PAULSON, HEIDI STOLT, MARC STOLT, MICHAEL MACHURICK, ELIZABETH MACHURICK, LUCINDA MARQUARDT, JAMES SZYMANSKI, TAMMIE SZYMANSKI, KYLE LADEAN, CINDY DEERE, JEROME KUCZMARSKI, JP VENDEN INVESTMENTS LLC, JASON VENDEN, AMY ROSENDAHL, FRANK ROSENDAHL.

Plaintiffs,

vs.

3M COMPANY (f/k/a MINNESOTA MINING AND MANUFACTURING, CO.); AHLSTROM RHINELANDER LLC, AHLSTROM NA SPECIALTY SOLUTIONS HOLDINGS INC, AHLSTROM NA SPECIALTY SOLUTIONS LLC; WAUSAU PAPER CORP., WAUSAU PAPER MILLS, LLC, BASF CORPORATION AND JOHN DOE DEFENDANTS 1-49,

Defendants.

**FOURTH AMENDED COMPLAINT**

**CLASS REPRESENTATION AND INDIVDUAL CLAIMS**

Plaintiffs, Lucas Rougeau, et al., on behalf of the themselves and all others similarly situated, by and through undersigned counsel, file their Fourth Amended Complaint against Defendants 3M Company; Ahlstrom Rhinelander LLC, Ahlstrom NA Specialty Solutions Holding Inc, Ahlstrom NA Specialty Solutions LLC (collectively, "Ahlstrom"); Wausau Paper Corp., Wausau Paper Mills, LLC (collectively, "Wausau Paper");BASF Corporation, and John Doe Defendants 1-49 (collectively, "Defendants"). Plaintiffs, based on information, belief, and investigation of Counsel, allege as follows:

## I. SUMMARY OF THE CASE

1. Plaintiffs and putative Class Members own properties in rural areas of Oneida County, Wisconsin. As a result of Defendants' actions, Plaintiffs' properties – including drinking water wells – are now injured pursuant to Wisconsin Statute 844.01 by per- and polyfluoroalkyl substances ("PFAS") including, but not limited to, perfluorooctanoic acid ("PFOA") and/or perfluorooctane sulfonic acid ("PFOS"). PFAS concentrations in Plaintiffs' private wells and nearby lakes are among the highest in the country and have been found at levels that are thousands of times greater than EPA health limits.

2. Over the course of decades, Defendant Ahlstrom, Wausau Paper and their predecessors disposed of millions of pounds of waste from the Rhinelander Paper Mill by dumping and spreading the waste on farmland throughout Oneida County, and specifically in the Town of Stella. Upon information and belief, this waste contained high levels of PFOA, PFOS, and other PFAS. It was this "land application" of waste that caused groundwater at Plaintiffs' properties to be among the most contaminated in the country for PFAS.

3. Defendants also caused significant contamination in multiple water bodies in or near Stella, Wisconsin. Snowden Lake, around which some Plaintiffs and Class Members live, contains PFOA + PFOS at levels greater than 1600 parts per trillion. Other nearby lakes in the Moen Lake Chain also contain levels in the hundreds of parts per trillion range. Wisconsin Department of Health Services, Bureau of Environmental and Occupational Health recommends limited consumption of fish from these water bodies and even cautions against swimming, waterskiing, tubing, or other activities that involve a higher chance of swallowing water. See Exhibit A attached to the Complaint. A PFAS advisory has been posted on Moen Lake, encouraging people to follow fish consumption advisories and "choose lower exposure activities" like boating and canoeing instead of swimming or waterskiing. See Exhibit B.

4. In addition to Defendants Ahlstrom– which owns and operates the Rhinelander Paper Mill – Plaintiffs also bring this action against Wausau Paper, the prior owner of the Rhinelander Paper Mill, and Defendant 3M, which sold and supplied PFAS chemicals to the Rhinelander Paper Mill.

5. PFOA and PFOS both are known to be toxic, persistent in the environment, not biodegradable, move easily through soil and groundwater, and pose a significant risk to human health and safety. Both are animal carcinogens and likely human carcinogens. Indeed, the United States Environmental Protection Agency ("EPA") has stated that "human epidemiology data report associations between PFOA exposure and high cholesterol, increased liver enzymes, decreased vaccination response, thyroid disorders, pregnancy-induced hypertension and preeclampsia, and

cancer (testicular and kidney)" and that "there is suggestive evidence of carcinogenic potential for PFOS."[1]

6. At all relevant times, upon information and belief, Defendant Ahlstrom, Wausau Paper and their predecessors knew or should have known about the inherent risks and dangers involved in applying PFAS-containing waste on farmlands. And at all relevant times, Defendants 3M and BASF knew or should have known about the inherent risks and dangers involved in the use of PFAS compounds in products sold to other companies, like Ahlstrom and Wausau Paper — including that both PFOA and PFOS are mobile in water, not easily biodegradable, highly persistent in the environment, and present significant and unreasonable risks to both human health and the environment. Nevertheless, Defendants made a conscious choice to manufacture, market, sell, and dispose of PFAS products and waste in a way that caused harm to Plaintiffs.

7. Plaintiffs have only recently discovered that their wells are contaminated, and therefore have been consuming contaminated well water for a significant period of time without their knowledge or consent.

8. Plaintiffs – including Class Representatives Heidi Stolt, Denise Terbeest, Dave Gorman, Lucinda Marquardt, Jerome Kuczmarski, and JP Venden Investments LLC – file to recover compensatory and all other damages, including but not limited to the costs of restoring

[1] *See* U.S. Envtl. Protection Agency ("EPA"), Office of Water Health and Ecological Criteria Division, "Health Effects Support Document for Perfluorooctanoic Acid (PFOA)," EPA Document Number: 822-R-16-003, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfoa_hesd_final-plain.pdf (last accessed 11/22/2022); *see also* EPA, Office of Water Health and Ecological Criteria Division,
"Health Effects Support Document for Perfluorooctane Sulfonate (PFOS)," EPA Document Number: 822-R-16- 002, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfos_hesd_final_508.pdf (last accessed 11/22/2022).

and remediating contamination from their real properties and drinking water wells, costs of treating water or otherwise accessing PFAS-free water, costs of acquiring bottled water, non-economic damages, loss of earnings and future earnings, damages for loss of use and enjoyment, lost property value, and household expenses, among others. Plaintiffs Carrie Brenton, Kerry Brenton, Don Endres, Diane Pilat, Lucinda Marquardt, James Szymanski, Cindy Deere, Amy Rosendahl, and Frank Rosendahl file individual claims to recover for personal injuries.

## II. PARTIES

### A. PLAINTIFFS

9. Lucas & Alisha Rougeau

   a. Mr. & Mrs. Rougeau are Wisconsin citizens and own property damaged as a result of the presence of Defendants' PFAS chemicals. PFAS have been detected in well water at the Rougeau's property at levels exceeding EPA standards.

   b. The injured property includes, but is not limited to, property located at 4176 Depot Road, Rhinelander, Wisconsin. A private water well on the property supplies water to the property.

10. Carrie and Kerry Brenton

   a. Mr. & Mrs. Brenton are Wisconsin citizens and own property damaged as a result of the presence of Defendants' PFAS chemicals. PFAS have been detected in well water at the Brenton's property at levels exceeding EPA standards.

b. The injured property includes, but is not limited to, property located at 4181 Depot Road, Rhinelander, Wisconsin.

c. Exposure to Defendants' PFAS has caused or was a substantial factor in causing high cholesterol in Plaintiffs Carrie and Kerry Brenton. Mr. & Mrs. Brenton have incurred, and will incur, costs and expenses related to their injuries.

11. Timothy and Melissa Gerdmann

a. Mr. & Mrs. Gerdmann are Wisconsin citizens and own property damaged as a result of the presence of Defendants' PFAS chemicals. PFAS have been detected in well water at the Gerdmann's property at levels exceeding EPA standards.

b. The injured property includes, but is not limited to, property located at 4187 Depot Road, Rhinelander, Wisconsin.

12. David and Robin Gorman

a. Mr. and Mrs. Gorman are Wisconsin citizens and own property damaged as a result of the presence of Defendants' PFAS chemicals. PFAS have been detected in well water at the Gormans' property at levels exceeding EPA health standards.

b. The injured property includes, but is not limited to, property located at 3242 County Highway C, Rhinelander, Wisconsin.

13. David and Kathi Grandt

a. Mr. and Mrs. Grandt are Wisconsin citizens and own property damaged as a result of the presence of Defendants' PFAS chemicals. PFAS have been detected in well water at the Grandts' property at levels exceeding EPA health standards.

b. The injured property includes, but is not limited to, property located at 3304 County Highway C, Rhinelander, Wisconsin.

14. Justin and Erin Hetzel

a. Mr. and Mrs. Hetzel are Wisconsin citizens and own property damaged as a result of the presence of Defendants' PFAS chemicals. PFAS have been detected in well water at the Hetzels' property at levels exceeding EPA health standards.

b. The injured property includes, but is not limited to, property located at 4036 Camp Bryn Afon Road, Rhinelander, Wisconsin.

15. Philip and Minnie Rene Iannarelli

a. Mr. and Mrs. Iannarelli are Wisconsin citizens and own property damaged as a result of the presence of Defendants' PFAS chemicals. PFAS have been detected in well water at the Iannarellis' property at levels exceeding EPA health standards.

b. The injured property includes, but is not limited to, property located at 2668 County Highway C, Rhinelander, Wisconsin. The Iannarellis' injured property includes multiple parcels.

16. Greg and Sylvia Canner

a. Mr. and Mrs. Canner are Wisconsin citizens and own property damaged as a result of the presence of Defendants' PFAS chemicals. PFAS have been detected in well water at the Canners' property at levels exceeding EPA health standards.

b. The injured Highway property includes, but is not limited to, property located at 3364 County C, Rhinelander, Wisconsin.

17. Don and Sarah Endres

a. Mr. and Mrs. Endres are Wisconsin citizens and own property damaged as a result of the presence of Defendants' PFAS chemicals. PFAS have been detected in well water at the Endres' property at levels exceeding EPA health standards.

b. The injured property includes, but is not limited to, property located at 4040 Camp Bryn Afon Road, Rhinelander, Wisconsin.

c. Exposure to Defendants' PFAS has caused or was a substantial factor in causing thyroid disease in Plaintiff Don Endres. Mr. Endres has incurred, and will incur, costs and expenses related to his injuries.

18. Jason DeBay

a. Mr. DeBay is a Wisconsin citizen and owns property damaged as a result of the presence of Defendants' PFAS chemicals. Defendants' PFAS have been detected in well water at Mr. DeBay's property.

b. The injured property includes, but is not limited to, property located at 3339 White Pine Road, Rhinelander, WI 54501

19. Sharon and Martin Lombardi, individually and on behalf of Martin A. Lombardi and Sharon M. Lombardi Revocable Trust.

a. Mr. and Mrs. Lombardi are Wisconsin citizens and are trustees of the Martin A. Lombardi and Sharon M. Lombardi Revocable Trust.

b. Martin A. Lombardi and Sharon M. Lombardi Revocable Trust holds in trust property located at 3348 County Highway C, Rhinelander, Wisconsin.

c. Defendants have injured this property; Defendants' PFAS have been detected in the property's well water.

20. Diane Pilat

a. Ms. Pilat is a Wisconsin citizen and owns property damaged as a result of the presence of Defendants' PFAS chemicals. PFAS have been detected in well water at Ms. Pilat's property.

b. The injured property includes, but is not limited to, property located at 2648 County Highway C, Rhinelander, WI 54501.

c. Exposure to Defendants' PFAS has caused or was a substantial factor in causing kidney disease in Ms. Pilat. Ms. Pilat has incurred, and will incur, costs and expenses related to his injuries, and Ms. Pilat's injuries have had a substantial impact on her quality of life.

21. Edward and Nancy Szymanski

a. Mr. and Mrs. Szymanski are Wisconsin citizens and own property damaged as a result of the presence of Defendants' PFAS chemicals. PFAS

have been detected in well water at the Szymanskis' property at levels exceeding EPA health standards.

b. The injured property includes, but is not limited to, property located at 3338 Meadow Lane, Rhinelander, Wisconsin.

22. Denise and Robert Terbeest

a. Mr. and Mrs. Terbeest are Wisconsin citizens and own property damaged as a result of the presence of Defendants' PFAS chemicals. PFAS have been detected in well water at the Terbeests' property at levels exceeding EPA health standards.

b. The injured property includes, but is not limited to, property located at 4330 Stella Lake Road, Rhinelander, Wisconsin.

23. David and Rebecca Martin

a. Mr. and Mrs. Martin are Wisconsin citizens and own property damaged as a result of the presence of Defendants' PFAS chemicals. PFAS have been detected in well water at the Martins' property at levels exceeding EPA health standards.

b. The injured property includes, but is not limited to, property located at 3278 County Highway C, Rhinelander, Wisconsin.

24. Steven Wakely

a. Mr. Wakely is a Wisconsin citizen and owns property damaged as a result of the presence of Defendants' PFAS chemicals. PFAS have been detected in well water at Mr. Wakely's property.

b. The injured property includes, but is not limited to, property located at 2536 Rosemil Lane, Rhinelander, WI 54501.

25. MP Snowden LLC and Patti and Michael Crump

a. MP Snowden LLC is a Wisconsin limited liability company and owns property damaged as a result of the presence of Defendants' PFAS chemicals. PFAS have been detected in well water at Plaintiff's property at levels exceeding EPA health standards.

b. MP Snowden LLC is owned by Plaintiffs Patti and Michael Crump, who are both Wisconsin citizens. Mr. and Mrs. Crump's use and enjoyment of the property has been impaired due to the presence of Defendants' PFAS. Additionally, Mr. and Mrs. Crump have and will incur costs associated with sourcing and treating water at the property.

c. The injured property includes, but is not limited to, property located at 3292 County Highway C, Rhinelander, Wisconsin.

26. Nicole and John Paulson

a. Mr. and Mrs. Paulson are Wisconsin citizens and own property damaged as a result of the presence of Defendants' PFAS chemicals. PFAS have been detected in well water at the Paulsons' property at levels exceeding EPA health standards.

b. The injured property includes, but is not limited to, property located at 3326 County Highway C, Rhinelander, Wisconsin.

27. Heidi and Marc Stolt

a. Mr. and Mrs. Stolt are Wisconsin citizens and own property damaged as a result of the presence of Defendants' PFAS chemicals. PFAS have been detected in well water at the Stolts' property at levels exceeding EPA health standards.

b. The injured property includes, but is not limited to, property located at 3336 County Highway C, Rhinelander, Wisconsin.

28. Michael and Elizabeth Machurick

a. Mr. and Mrs. Machurick are Wisconsin citizens and own property damaged as a result of the presence of Defendants' PFAS chemicals. PFAS have been detected in well water at the Machuricks' property at levels exceeding EPA health standards.

b. The injured property includes, but is not limited to, property located at 3358 County Highway C, Rhinelander, Wisconsin.

29. Lucinda Marquardt

a. Ms. Marquardt is a Wisconsin citizen and owns property damaged as a result of the presence of Defendants' PFAS chemicals. PFAS have been detected in well water at Ms. Marquardt's property.

b. The injured property includes, but is not limited to, property located at 3340 White Pine Road, Rhinelander, WI 54501.

c. Exposure to Defendants' PFAS caused or was a substantial factor in causing kidney cancer in Ms. Marquardt. Ms. Marquardt has incurred, and will incur, costs and expenses related to her injuries.

30. James and Tammie Szymanski

a. Mr. and Mrs. Szymanski are Wisconsin citizens and own property damaged as a result of the presence of Defendants' PFAS chemicals. PFAS have been detected in well water at the Szymanskis' property at levels exceeding EPA health standards.

b. The injured property includes, but is not limited to, property located at 3262 White Pine Road, Rhinelander, Wisconsin.

c. Exposure to Defendants' PFAS has caused or was a substantial factor in causing high cholesterol in Mr. Szymanski. Mr. Szymanski has incurred, and will incur, costs and expenses related to his injuries.

d. Exposure to Defendants' PFAS has caused or was a substantial factor in causing high cholesterol in Ms. Szymanski. Ms. Szymanski has incurred, and will incur, costs and expenses related to her injuries.

31. Kyle Ladean

a. Mr. Ladean is a Wisconsin citizen and owns property damaged as a result of the presence of Defendants' PFAS chemicals. PFAS have been detected in well water at Mr. Ladean's property.

b. The injured property includes, but is not limited to, property located at 2542 Rosemil Lane, Rhinelander, WI 54501.

32. Cindy Deere

a. Ms. Deere is a Wisconsin citizen and owns property damaged as a result of the presence of Defendants' PFAS chemicals. PFAS have been detected in well water at Ms. Deere's property.

b. The injured property includes, but is not limited to, property located at 2427 County Highway C, Rhinelander, Wisconsin.

c. Exposure to Defendants' PFAS caused or was a substantial factor in causing high cholesterol in Ms. Deere. Ms. Deere has incurred, and will incur, costs and expenses related to her injuries.

33. Jerome Kuczmarski

a. Mr. Kuczmarski is a Wisconsin citizen and owns property damaged as a result of the presence of Defendants' PFAS chemicals. PFAS have been detected in well water at Mr. Kuczmarski's property.

b. The injured property includes, but is not limited to, property located at 2777 County Highway C, Rhinelander, Wisconsin.

c. Mr. Kuczmarski allowed Defendants to apply sludge on Mr. Kuczmarski's property, and at no point did Defendants warn Mr. Kuczmarski that the sludge contained dangerous levels of PFAS.

34. JP Venden Investments LLC

a. JP Venden Investments LLC is a domestic limited liability company in Wisconsin.

b. JP Venden Investments LLC owns property located at or near 3980 Lakeshore Drive, Rhinelander, Wisconsin. The property is located on/adjacent to Moen Lake, which has been affected by PFAS. JP Venden Investments LLC has riparian rights at Moen Lake associated with its ownership of property. JP Venden Investments LLC's property has been

injured as a result of the presence of PFAS in Moen Lake. The members of JP Venden Investments, LLC are all citizens of Wisconsin.

35. Jason Venden

a. Jason Venden is a member of JP Venden Investments LLC, which owns property located at or near 3980 Lakeshore Drive, Rhinelander, Wisconsin. Mr. Venden also lives at the property. Mr. Venden is a citizen of Wisconsin.

b. Mr. Venden has suffered a loss of use and enjoyment of the property where he lives and of Moen Lake due to the presence of PFAS in Moen Lake and in the Moen Lake chain.

36. Amy and Frank Rosendahl

a. Mr. and Mrs. Rosendahl are Wisconsin citizens and own property damaged as a result of the presence of Defendants' PFAS chemicals. PFAS have been detected in well water at the Rosendahls' property at levels exceeding EPA health standards.

b. The injured property includes, but is not limited to, property located at 3274 County Highway C, Rhinelander, Wisconsin.

c. Exposure to Defendants' PFAS caused or was a substantial factor in causing high cholesterol in both Mr. and Mrs. Rosendahl. Mr. and Mrs. Rosendahl have incurred, and will incur, costs and expenses related to her injuries.

37. The Plaintiffs have a property interest in their residential property, its water well and associated piping, and in the reasonable use of the groundwater or surface water they use at their property. The Putative Class Members include citizens of states outside of Wisconsin who have felt their economic harm and their principal injuries in the state of their citizenship, which is a state other than Wisconsin.

## B. DEFENDANTS

38. Defendants Ahlstrom Rhinelander LLC, Ahlstrom NA Specialty Solutions Holdings Inc, and/or Ahlstrom NA Specialty Solutions LLC ("Ahlstrom") own and/or operate a facility at 515 West Davenport Street, Rhinelander, Wisconsin 54501 and 114 W. Kemp St. Rhinelander, Wisconsin 54501. This Complaint refers to this facility as the "Rhinelander Paper Mill." Upon current information and belief, Ahlstrom Rhinelander, LLC has a single member, which is Ahlstrom NA Specialty Solutions, LLC. Upon current information and belief, Ahlstrom Specialty Solutions, LLC has a single member, which is Ahlstrom Specialty Solutions Holdings, Inc. Upon current information and belief, Ahlstrom Specialty Solutions Holdings, Inc. is a Delaware Corporation with its principal place of business in Connecticut. Upon current information and belief, Ahlstrom Rhinelander LLC, Ahlstrom NA Specialty Solutions Holdings, Inc. and Ahlstrom NA Specialty Solutions, LLC are all citizens of Delaware and Connecticut. The Ahlstrom defendants are primary defendants in this action under 28 U.S.C. 1332(d)(4)(B).

39. At the Rhinelander facility, Ahlstrom and its predecessors used PFAS products manufactured by 3M and BASF.

40. Ahlstrom then improperly disposed of PFAS-containing waste by spreading tons of this waste on farms in the Rhinelander area.

41. Defendants, Wausau Paper Corp. and Wausau Paper Mills, LLC, (collectively "Wausau Paper") which formerly owned and operated the Rhinelander Paper Mill and/or retains or contractually acquired liability for the prior ownership and operation of the Rhinelander Paper Mill. Upon current information and belief, Wausau Paper Mills, LLC has a single member, which is Wausau Paper Corp. Upon current information and belief, Wausau Paper Corp is a Wisconsin Corporation with a principal place of business in Pennsylvania. Upon current information and belief, Wausau Paper Corp. and Wausau Paper Mills, LLC are citizens of Wisconsin and Pennsylvania.

42. Wausau Paper operated the Rhinelander Paper Mill until August 2, 2013 when the Rhinelander Paper Mill was transferred to Ahlstrom and/or its successors in interest.

43. At the Rhinelander facility, Wausau Paper and its predecessors used PFAS products manufactured by 3M and BASF.

44. Wausau Paper then improperly disposed of PFAS-containing waste by spreading tons of this waste on farms in the Rhinelander area.

45. 3M: Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 3M Center, St. Paul, Minnesota 55144. At all times relevant, 3M manufactured, marketed, promoted, distributed, and/or sold PFAS including PFOA and/or PFOS to Ahlstrom and/or Wausau Paper for use at the Rhinelander Paper Mill. 3M Company is a primary defendant in this action under 28 U.S.C. 1332(d)(4)(B).

46. BASF Corporation: Defendant BASF Corporation ("BASF") is a Delaware corporation with its principal place of business at 100 Park Avenue, Florham Park, New Jersey

07932. Upon information and belief, BASF acquired Ciba-Geigy Corporation and/or Ciba Specialty Chemicals. BASF is registered to do business in Wisconsin. Upon information and belief, Ciba-Geigy Corporation and/or Ciba Specialty Chemicals does and/or has done business throughout the United States, including Wisconsin. As used throughout this complaint, "BASF" includes all predecessors and entities acquired by BASF, including Ciba-Geigy Corporation and Ciba Specialty Chemicals.

## III. JURISDICTION & VENUE

47. This Court has jurisdiction pursuant to 28 U.S.C. §1332(d). Minimal diversity exists between the Plaintiffs and the Defendants. The Plaintiffs are located in Wisconsin, and the Ahlstrom Defendants, 3M, and BASF are incorporated and maintain principal places of business in locations other than Wisconsin, as outlined above. Plaintiffs' claims exceed the required amount in controversy; this is a class action where the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs. The proposed Class would include 100 or more Class Members. Furthermore, this case is a matter of national concern where numerous class actions asserting the same or similar factual allegations on behalf of the same or other persons have been filed against 3M Company within three years of the filing of this class action.[2] The primary defendants are not all citizens of the State of Wisconsin.

---

2 See a listing of litigation including class allegations asserting the same or similar factual allegations (p. 83 et. seq.): https://www.sec.gov/Archives/edgar/data/66740/000130817924000309/mmm4298631-ars.pdf. *See also, more particularly Ryan v. Grief, Inc., et al.* Case No. 4:22-cv-4009-MRG, United States District Court for the District of Massachusetts; *Parris v. 3M Company, et al.* Case No. 4:21-cv-00040-TWT, United States District Court for the Northern District of Georgia; *Weatherford v. E.I. Dupont De Nemours & Company, et al.* Case No. 4:22-cv-01427-JDA, United States District Court for the District of South Carolina.

48. Venue is appropriate in this judicial district pursuant to 28 U.S.C. §1391(a) because a substantial part of the property that is the subject of the action is situated in this judicial district and division.

## IV. FACTUAL ALLEGATIONS COMMON TO ALL PLAINTIFFS AND CLASS MEMBERS

### A. THE PFAS CONTAMINANTS AT ISSUE: PFOA AND PFOS, AMONG OTHERS

49. Both PFOA and PFOS fall within a class of chemical compounds known as per- and polyfluoroalkyl substances ("PFAS"). PFAS are sometimes described as long-chain and short-chain compounds, depending on the number of carbon atoms contained in the carbon chain. PFOA and PFOS are considered long-chain PFAS because they each have eight carbon atoms in their chains.

50. PFOA and PFOS are stable, man-made chemicals. They are highly water soluble, persistent in the environment and resistant to biologic, environmental, or photochemical degradation. Because these compounds are water soluble and do not readily adsorb to sediments or soil, they tend to stay in the water column and can be transported long distances. PFOA, PFOS and PFAS are frequently referred to as "forever chemicals" because of their ability to resist breakdown and degradation in the environment. Coincidentally, these same attributes give PFAS chemicals an especially long shelf life often times exceeding 20-25 years and probably as long as 40 years.

51. Both PFOA and PFOS are readily absorbed in animal and human tissues after oral exposure and accumulate in the serum, kidney, and liver. They have been found globally in

water, soil, and air as well as in human food supplies, breast milk, umbilical cord blood, and humanblood serum.[3]

52. Moreover, PFOA and PFOS are persistent in the human body and resistant to metabolic degradation. A short-term exposure can result in a body burden that persists for years and can increase with additional exposures.[4]

53. Notably, from the time these two compounds were first produced, information has since emerged showing negative health effects caused by exposure to PFOA and PFOS. According to the EPA, studies indicate that exposure of PFOA and PFOS over certain levels may result in a number of adverse impacts to human health. [5] [6]

54. In June 2022, after evaluating over 400 studies published since 2016 and applying human health risk assessment approaches, tools, and models, EPA concluded that the new data

---

[3] *See* Agency for Toxic Substances and Disease Registry, "Per- and Polyfluoroalkyl Substances and Your Health," available at https://www.atsdr.cdc.gov/pfas/health-effects/index.html (last accessed 11/22/2022).

[4] *See* U.S. Envtl. Protection Agency ("EPA"), Office of Water Health and Ecological Criteria Division, "Health Effects Support Document for Perfluorooctanoic Acid (PFOA)," EPA Document Number: 822-R-16-003, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfoa_hesd_final-plain.pdf (last accessed 11/22/2022); *see also* EPA, Office of Water Health and Ecological Criteria Division,
"Health Effects Support Document for Perfluorooctane Sulfonate (PFOS)," EPA Document Number: 822-R-16- 002, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfos_hesd_final_508.pdf (last accessed 11/22/2022).

[5] *See* EPA, "Fact Sheet PFOA & PFOS Drinking Water Health Advisories," EPA Document Number: 800-F-16-003, available at https://www.epa.gov/sdwa/drinking-water-health-advisories-pfoa-and-pfos (last accessed 11/22/2022).

[6] *See* EPA, "Health Effects Support Document for Perfluorooctane Sulfonate (PFOS)," Document Number: 822 R-16-002, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfos_hesd_final_508.pdf (last accessed 11/22/2022).

indicates that the levels of PFOA and/or PFOS exposure at which negative outcomes could occur are much lower than previously understood when the agency issued its 2016 HAs for PFOA and PFOS (70 parts per trillion or ppt). In 2022, EPA announced new Interim Updates Health Advisory levels for PFOA of 0.004 ppt and 0.02 ppt for PFOS.[7]

55. In March 2023, EPA proposed Maximum Contaminant Levels (MCL) for six PFAS in drinking water: PFOA, PFOS, PFHxS, PFNA, GenX, and PFBS. For PFOA and PFOS, EPA established a MCL of 4 ppt. For the other four compounds, EPA's MCL is based on a hazard index where all four compounds are considered together. The maximum amount of each PFAS that could be allowed without exceeding the EPA MCL is as follows: GenX – 10 ppt; PFBS – 2000 ppt; PFNA – 10 ppt; PFHxS – 9 ppt. EPA finalized these MCLs on April 10, 2024.[8]

56. On April 19, 2024 the EPA released a final rule designating PFOA and PFOS as hazardous substances under the Comprehensive Environmental Response Compensation, and Liability Act. The EPA stated that it "reached this decision after evaluating the available scientific and technical information about PFOA and PFOS and determining that they may present a substantial danger to the public health or welfare or the environment when released."[9] The EPA expressly declined to exclude paper mill sludge from the final rule, finding that there was no evidence that paper mill sludge and biosolids do not present a substantial danger to public health, welfare, or the environment.[10]

---

[7] EPA, "Technical Fact Sheet: Drinking Water Health Advisories for Four PFAS (PFOA, PFOS, GenX chemicals, and PFBS)," EPA Document Number 822-F-22-002, available at https://www.epa.gov/system/files/documents/2022-06/technical-factsheet-four-PFAS.pdf (last accessed June 30, 2022).
[8] https://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas
[9] https://www.govinfo.gov/content/pkg/FR-2024-05-08/pdf/2024-08547.pdf
[10] https://www.govinfo.gov/content/pkg/FR-2024-05-08/pdf/2024-08547.pdf

57. PFAS have been categorized as endocrine disruptors that interfere with the normal function of the endocrine system and the reproductive and biological processes associated with it.

58. PFAS chemicals have also been characterized as immunotoxin due to their adverse effect on the human immune system. Children exposed prenatally to PFAS show deficient antibody responses.

## B. DEFENDANTS' KNOWLEDGE AND CONCEALMENT OF PFOA/PFOS HAZARDS

59. On information and belief, by the 1970s, Defendant 3M knew, or reasonably should have known, among other things, that: (1) PFOA and PFOS are toxic; and (2) upon entering the environment, PFOA and PFOS migrate through the subsurface, mix easily with groundwater, resist natural degradation, render drinking water unsafe and/or non-potable, and can be removed from property and drinking water supplies only at substantial expense.

60. At all times pertinent herein, Defendants also knew or should have known that PFOA and PFOS present a risk to human health and could be absorbed into the lungs and gastrointestinal tract, potentially causing severe damage to the liver, kidneys, and central nervous system, in addition to other toxic effects, and that PFOA and PFOS are known carcinogens that cause genetic damage.

61. For instance, in 1980, 3M published data in peer reviewed literature showing that humans retain PFOS in their bodies for years. Based on that data, 3M estimated that it could take a person up to 1.5 years to clear just half of the accumulated PFOS from their body after all exposures had ceased.[11]

---

[11] *See* Envtl. Working Group ("EWG"), "New Data on Half Life of Perfluorochemicals in Serum,"

62. By the early 1980s, the industry suspected a correlation between PFOS exposure and human health effects. Specifically, manufacturers observed bioaccumulation of PFOS in workers' bodies and birth defects in children of workers.

63. Beginning in 1983, 3M documented a trend of increasing levels of PFOS in the bodies of 3M workers. In an internal memo, 3M's medical officer warned: "[W]e must view this present trend with serious concern. It is certainly possible that [...] exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."[12]

64. BASF was aware and knew of 3M's research and prior studies regarding PFOS and PFOA. Moreover, BASF, and its suppliers conducted independent studies, research and analysis regarding the adverse correlation between PFOS, PFOA, and human health. BASF was further on notice of dangers posed by fluorochemical products when 3M stopped selling PFOS-containing fluorochemical products in or around 2000.

65. BASF sold PFOA-containing fluorochemical products after 3M stopped selling PFOS-containing fluorochemical products to the Rhinelander Mill. BASF minimized the risks associated with its fluorochemical products and failed to properly notify the Mill of risks to health and the environment associated with its fluorochemical products.

66. Notwithstanding their respective knowledge of the dangers involved with PFAS Products, 3M and BASF willfully, negligently and carelessly: (1) designed, manufactured,

---

available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades (last accessed 11/22/2022) (in particular, please refer to the "Letter from 3M to Office of Pollution Prevention and Toxics," referenced in the article).

[12] *See id.* (in particular, please refer to the "Organic Fluorine Levels" Memorandum referenced in the article).

marketed, and/or sold PFAS Products containing PFOA and/or PFOS; (2) issued instructions on how PFAS Products should be used and disposed of, thus improperly permitting PFOA and/or PFOS to contaminate soil and groundwater; (3) failed to recall and/or warn users of PFAS Products of the dangers of soil and groundwater contamination as a result of the standard use and disposal of these products; and, (4) further failed and refused to issue the appropriate warnings and/or recalls to the users of PFAS Products, notwithstanding the fact that Defendants knew the identity of those users.

67. The Rhinelander Paper Mill was established in approximately 1903. It was acquired or through merger and acquisition became Wausau Paper in approximately 1997. In approximately August of 2013 Wausau Paper Mills, LLC and Wausau Paper Corp. sold the Rhinelander Paper Miller to Expera Specialty Solutions, LLC and/or other successors in interest to Ahlstrom. Through these names changes, mergers and/or acquisitions there was an identity of ownership which remained the same. Additionally, or in the alternative, as part of the sale of the Rhinelander Paper Mill from Wausau Paper Mills, LLC and Wausau Paper Corp, Wausau Paper contractually retained some or all pre-sale liabilities related to the Rhinelander Paper Mill.

68. In Wisconsin, the spreading of paper mill sludge is regulated by the Wisconsin Department of Natural Resources (DNR). Before spreading sludge, companies need to obtain permits that require them to assess and report on the soil characteristics of the land where the sludge will be applied. Sandy soil is known for its high permeability, which influences how contaminants in the sludge migrate into groundwater.

69. Upon information and belief, Defendants failed to inform the DNR that the sludge contained elevated and dangerous concentrations of PFAS chemicals.

70. For decades until the present, Ahlstrom, Wausau Paper and their predecessors delivered and applied PFAS-laden waste sludge to landowners in the area. As reflected in Annual Land Application Reports, Ahlstrom and Wausau Paper spread millions of pounds of this waste sludge over thousands of acres of farmland. Upon information and belief, neither Ahlstrom nor Wausau Paper warned the property owners of the dangers associated with PFAS applied to their properties, nor did they warn landowners in communities that could be affected by their waste application.

71. Upon information and belief, Ahlstrom, Wausau Paper, and their predecessors knew or should have long known of the dangers associated with PFAS in products made and used at the Rhinelander Paper Mill and knew that disposal of PFAS-containing waste on farmlands could lead to groundwater contamination.

72. Upon information and belief, at no point did Ahlstrom, Wausau Paper, or their predecessors advise the owners of land upon which Rhinelander Paper Mill waste was applied that the Mill's waste may contain dangerous PFAS forever chemicals, including PFOA or PFOS.

73. Ahlstrom, Wausau Paper, and their predecessors operated, owned, and/or had responsibility for the Rhinelander Paper Mill during time periods relevant to Plaintiffs' claims. Ahlstrom, Wausau Paper, and their predecessors maintained the same employees, products, and facilities through the various mergers, acquisitions and/or name changes. Ahlstrom and/or Wausau Paper merged with, acquired, and/or created other businesses by merger, acquisition, name change, and/or otherwise expressly and impliedly agreed and/or assumed obligations and liability under applicable contracts, and had a duty to remedy the past wrongs of those parties for whose fault or obligations they are legally responsible. To the extent that Ahlstrom and/or Wausau Paper acquired

the business or assets of a predecessor without a formal merger, Ahlstrom and/or Wausau Paper is liable under the de facto merger and mere continuation doctrines of Wisconsin law. In the alternative, Ahlstrom and/or Wausau Paper contractually assumed and/or transferred liabilities related to the Rhinelander Paper Mill.

74. As a direct result of Defendants' acts alleged in this Complaint, Plaintiffs' Properties have been contaminated, and will continue to be contaminated, with PFOA and PFOS. This has created an environmental and public health hazard until such contamination may be remediated. As a direct and proximate result, Plaintiffs must assess, evaluate, investigate, monitor, remove, clean up, correct, and remediate PFAS contamination from their properties at significant expense, loss and damage to Plaintiffs.

75. Defendants had a duty to evaluate and test such products adequately and thoroughly to determine their environmental fate and transport characteristics and potential human health and environmental impacts before they sold such products, but they breached this duty. Defendants moreover breached their duty to minimize the environmental harm caused by PFOA and PFOS and other PFAS forever chemicals. Moreover, Defendants failed to warn Plaintiffs of the known risks for environmental and health hazards arising from the usage of Defendants' PFAS in their intended manner for its intended purpose.

## C. THE IMPACT OF PFOA AND PFOS ON PLAINTIFFS AND CLASS MEMBERS

76. As discussed above, Plaintiffs own real properties injured by PFAS. Some Plaintiffs and Class Members own private drinking water wells contaminated with PFAS, some own real property contaminated with PFAS, and some own property with or around surface waterbodies

that are contaminated with PFAS. Plaintiffs and Class Members with contaminated private wells have been regularly exposed to dangerously high levels PFOS and PFOA compounds.

77. The detection and/or presence of PFAS -- including PFOA and PFOS -- and the threat of further detection and/or presence of PFAS, on Plaintiffs' Properties and in contaminated waterbodies has resulted, and will continue to result, in significant injury and damage to Plaintiffs.

78. The invasion of Plaintiffs' Properties with PFOA and PFOS is continuous and recurring, as new contamination flows regularly and constantly into Plaintiffs' Properties each day—the result of which is a new harm to each Plaintiff and its property in each and every occurrence.

79. The injuries to Plaintiffs and Class Members caused by Defendants' conduct constitute an unreasonable interference with, and damage to, the limited subterranean and surficial supplies of fresh drinking water on which Plaintiffs' wells depend. Defendants' actions have also caused an unreasonable interference with the land where Defendants caused PFAS to be land applied and with the contaminated surface waterbodies located on or adjacent to Plaintiffs' and Class Members' properties.

80. Plaintiffs' exposure to PFAS has occurred, and continues to occur, on a daily basis. This repeated exposure has caused Plaintiffs considerable fear and concern.

81. Through this action, Plaintiffs seek to recover damages (including but not limited to compensatory, punitive, and/or consequential damages) arising from both personal injury to certain Plaintiffs, the continuous and ongoing contamination of all Plaintiffs' Properties by Defendants' PFAS, and the continuous and ongoing harm to Plaintiffs and Class Members caused by contamination of surface waterbodies located on or adjacent to Plaintiffs' and Class Members'

properties. Such damages moreover include, but are not limited to, the past and future costs of restoring and remediating contamination from their real properties and drinking water wells, loss of use and enjoyment of property, increased costs for septic tank cleanout caused by the presence of the defendants hazardous chemicals, past and future medical expenses (for those alleging personal injuries), loss of earnings, and household expenses, among others.

**CLASS ACTION ALLEGATIONS**

82. Plaintiffs, Heidi Stolt, Denise Terbeest, Dave Gorman, Lucinda Marquardt, Jerome Kuczmarski, and JP Venden Investments LLC, on behalf of themselves and all others similarly situated bring this action for injury in fact as a result of the presence of PFAS at Plaintiffs' properties and in waterbodies at or adjacent to Plaintiffs' properties as a result of Defendants' unlawful conduct, excluding personal injury damage.

83. The proposed Class Definition is "all owners of real property in Oneida County generally within the map depicted below and within the red outline of the class area since September 2022 where the land application of PFAS-containing paper mill sludge has caused harm to property, including (1) properties in the contaminated area where land application of sludge from the Rhinelander Mill has caused contamination of groundwater and the sole source of drinking water to the property is groundwater, including but not limited to those properties where an existing private well has been found to contain PFAS; (2) properties where PFAS-containing paper mill sludge has been land applied; and (3) properties located adjacent to – or which possess riparian rights to – Snowden Lake, Moen Lake, Second Lake, Third Lake, Fourth Lake, Fifth Lake, Starks Creek, the north branch of the Pelican River, or any other surface waterbody within the

geographic limitations outlined above that contains PFAS as a result of the land application of PFAS-containing paper mill sludge from the Rhinelander Mill.




84. The Class is divided into the following subclasses:

a. Property owners whose property is located in the contaminated area where land application of sludge from the Rhinelander Mill has caused contamination of groundwater and the sole source of drinking water to the property is groundwater. Heidi Stolt, Denise Terbeest, Dave Gorman, and/or Lucinda Marquardt are proposed class representatives for this subclass.

b. Property owners whose property was a site of land application of sludge from the Rhinelander Mill. Jerome Kuczmarski is the class representative for this subclass. ("Sludge Application Subclass")

c. Property owners whose properties are located adjacent to Snowden Lake, Moen Lake, Second Lake, Third Lake, Fourth Lake, Fifth Lake, Starks Creek, the north branch of the Pelican River, or any other surface waterbody that contains PFAS as a result of the land application of PFAS-containing paper mill sludge from the Rhinelander Mill. Heidi Stolt, Denise Terbeest, Dave Gorman, JP Venden Investments LLC, and/or Lucinda Marquardt are proposed class representatives for this subclass.

85. Excluded from the putative class are Defendants and their officers and directors.

86. Plaintiffs reserve the right to modify or amend the Class Definition before the Court determines whether certification is appropriate.

87. Ascertainability. The members of the Class are readily ascertainable by reference to public property records, land application records, water testing records, and personal and employment records.

88. Numerosity. The members of the Class are so numerous that their individual joinder is impracticable. Upon information and belief, there are over 100 putative Class Members.

89. Existence and predominance of Common Questions of Law and Fact. Common questions of law and fact that exist as to all members of the Class predominate over any questions affecting only individual class members. All members of the Class have been subject to the same conduct and suffer injuries as a result. Questions of law or fact which are common to the Class, as

set forth in this Complaint, predominate over questions affecting individual members because class members are similarly situated victims of Defendants' common course of conduct. Defendants' conduct similarly harmed all Class Members because Defendants designed, manufactured, promoted, sold, and disposed of PFAS in a way that led to the injury of Plaintiffs' properties. In addition, Defendants have no defenses specific to individual Class Members, and Defendants' defenses, if any, apply equally to all members of a subclass. The common legal and factual questions include, but are not limited to, the following:

a. whether PFAS are unreasonably dangerous;

b. whether PFAS applied to land as waste contaminated nearby properties, surface waterbodies, and private wells;

c. whether Defendants could have reasonably foreseen that PFAS, when used and disposed of as intended, would contaminate nearby properties, surface waterbodies, and private wells;

d. whether the presence of PFAS on properties and in private wells constitutes trespass or nuisance;

e. whether Defendants owed Plaintiffs and Class Members a duty to ensure that their PFAS, when used and disposed of as intended, did not contaminate properties, private wells, and surface waterbodies;

f. whether Defendants owed Plaintiffs and Class Members a duty to warn about hazards associated with PFAS when used and disposed of as intended or reasonably foreseen;

g. whether Defendants owed Plaintiffs and Class Members a duty to warn about PFAS Products' propensity to expose individuals to PFAS through contamination of properties and private wells;

h. whether Defendants breached their duties;

i. whether Defendants' actions directly and proximately caused Plaintiffs' and Class Members' injuries and damages;

j. who among the Defendants' holds legal responsibility for harm caused by the land application of PFAS;

k. when PFAS-containing products were used at the Rhinelander Mill;

l. when PFAS-containing sludge from the Rhinelander Mill was land applied in the Stella area;

m. whether Defendants' conduct supports an award of punitive damages.

90. Typicality. Plaintiffs' claims are typical of the claims of the members of the Class in that Plaintiffs are members of the Subclass that Plaintiffs seek to represent. Plaintiffs own properties injured by PFAS compounds from the Rhinelander Paper Mill.

91. Adequacy of Representation. Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel experienced in litigating environmental torts, products liability, personal injury, and class actions. Plaintiffs have no adverse or antagonistic interests to those in the Class and will fairly and adequately protect the interests of the Class. Plaintiffs' attorneys are aware of no interests adverse or antagonistic to those of the Plaintiffs and proposed Class.

92. Superiority. A class action is superior to any other theoretically available method for the fair and efficient adjudication of this controversy. Significant economies of time, effort, and expense will inure to the benefit of the Court and the parties in litigation of essentially identical issues on a class-wide rather than a repetitive individual basis. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system and the issues raised by this action. The damages or other financial detriment suffered by individual Class members may be relatively small compared to the burden and expense that would be entailed by individual litigation of the claims against the Defendants. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. No unusual difficulties are likely to be encountered in the management of this class action, and concentrating the litigation in a single forum is particularly convenient to the parties.

## VI. FIRST CAUSE OF ACTION

**Class and Individual Claims for Strict Liability - Design Defect and/or Defective Product (against 3M, BASF Corporation & John Doe Defendants)**

93. Plaintiffs, on behalf of themselves and others similarly situated, reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

94. As a manufacturer, designer, formulator, distributor, supplier, seller and marketer of products containing PFAS, including PFOA and PFOS, Defendants owed a duty to all persons whom its PFAS Products might foreseeably harm, not to market and sell any product which poses an unreasonable risk of injury from its intended and foreseeable uses.

95. Defendants designed, manufactured, formulated, promoted, marketed, distributed, exchanged and/or sold PFAS products.

96. Defendants designed, manufactured, formulated, set specifications for, exchanged, promoted, marketed and/or otherwise supplied (directly or indirectly) PFAS Products that were used at the Rhinelander Paper Mill and ultimately contaminated Plaintiffs' property.

97. At all relevant times, the foreseeable risks of harm posed by Defendants' products could have been reduced or avoided by the adoption of a reasonable alternative design by the manufacturer, and the omission of the alternative design rendered the products not reasonably safe.

98. Defendants represented, asserted, claimed and warranted that PFAS Products did not require any special handling or precautions with respect to disposal to prevent PFAS contamination of property and human exposure.

99. Defendants knew or reasonably should have known that PFAS Products were to be purchased and used by Ahlstrom and/or Wausau Paper without inspection for defects.

100. When Defendants placed PFAS Products into the stream of commerce, they were defective, unreasonably dangerous, and not reasonably suited for intended, foreseeable and ordinary transportation, storage, handling, and uses for the following reasons, among others:

a. PFAS compounds have a tendency to mix with groundwater and migrate great distances;

b. PFAS compounds readily escape from PFAS Products and have a tendency to mix with nearby waste;

c. unintended discharges of PFAS from PFAS products are commonplace;

d. PFAS Products cause extensive groundwater contamination when used and disposed of in a foreseeable and intended manner;

e. PFAS compounds persist in the environment and resist biodegradation;

f. certain PFAS compounds biodegrade to PFOA and PFOS;

g. even at extremely low levels, PFAS, including PFOA and PFOS render drinking water unsuitable for human consumption and use;

h. PFAS, including PFOA and PFOS pose significant threats to the public health and welfare and the environment;

i. PFAS, including PFOA and PFOS are associated with serious human health risks including the risk of cancers;

j. Defendants failed to conduct reasonable, appropriate or adequate scientific studies to evaluate the environmental fate and transport and potential human health effects of PFAS, including PFOA and PFOS before marketing PFAS Products

k. At all times relevant to this action, feasible alternatives that would have eliminated the unreasonable danger posed by PFAS, including PFOA and PFOS, without excessive costs or loss of product efficiency, were available.

101. The defective conditions existed at the time the product left the control of the manufacturer, the product reached the user without substantial change in the condition in which it was sold, and the defective condition ultimately caused Plaintiffs' damages.

102. Upon information and belief, Defendants specifically represented that their PFAS products had significant periods of useful life, spanning beyond 15 years.

103. At all times relevant to this action, PFAS Products were dangerous to an extent beyond that which would be contemplated by the ordinary consumer, and/or the risk of harm to public health and welfare and the environment posed by PFAS Products outweighed the cost to defendant of reducing or eliminating such risk.

104. At all times relevant to this action, PFAS Products were used in a manner in which they were foreseeably intended to be used and without substantial change in their condition, and as a proximate result of the defects previously described, PFAS proximately caused Plaintiffs to sustain the injuries and damages set forth in this Complaint.

105. As a direct and proximate result of defendants' acts and omissions as alleged in this Complaint:

a. Plaintiffs’ water supplies were and continue to be contaminated with PFOA, PFOS, and other PFAS compounds;

b. Plaintiffs were exposed to hazardous chemical substances through their ordinary use of contaminated water for drinking, cooking, bathing, and cleaning; and

c. Plaintiffs’ properties were and continue to be contaminated such that they have incurred, are incurring, and will incur, substantial costs for investigation, remediation, cleanup, restoration, removal, treatment, and monitoring. Additionally, Plaintiffs may be forced to incur substantial costs to connect their homes to a municipal water supply, and they would then face monthly charges and bills for water use.

106. As a further direct and proximate result of the acts and omissions of the defendants alleged in this Complaint, Plaintiffs have sustained and will sustain other substantial expenses and damages, in an amount within the jurisdictional limits of this Court, for which defendants are strictly, jointly and severally liable.

107. The injuries to Plaintiffs caused and/or threatened by defendants' acts and omissions as alleged in this Complaint are indivisible.

108. 3M and BASF knew that it was substantially certain that the acts and omissions described above would threaten public health and cause extensive contamination of property and drinking water supplies. 3M and BASF committed each of the above-described acts and omissions maliciously, fraudulently, willfully and/or wantonly, with conscious disregard for probable injury, or with gross negligence or oppressiveness. Such conduct was not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing.

109. 3M and BASF's conduct is reprehensible, despicable, and was performed to promote sales of PFAS Products in conscious and/or reckless disregard of the known risks of injury to health and property. 3M and BASF acted with conscious, willful, and wanton disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon Plaintiffs. Therefore, Plaintiffs request an award of exemplary and punitive damages in an amount reasonable, appropriate, and sufficient to punish this Defendant and deter it from ever committing the same or similar acts.

## VII. SECOND CAUSE OF ACTION

**Class and Individual Claims for Strict Liability - Failure to Warn / Inadequate Instructions or Warnings**

**(against 3M, BASF, and John Doe Defendants)**

110. Plaintiffs, on behalf of themselves and others similarly situated, reallege and reaffirm the allegations set forth in all preceding paragraphs.

111. Defendants designed, manufactured, formulated, promoted, marketed, distributed, exchanged and/or sold PFAS Products to commercial users including Ahlstrom and/or Wausau Paper.

112. Defendants designed, manufactured, formulated, set specifications for, exchanged, promoted, marketed and/or otherwise supplied (directly or indirectly) PFAS Products that were delivered to Ahlstrom and/or Wausau Paper and onto Plaintiffs' properties.

113. Defendants represented, asserted, claimed and warranted that PFAS Products could be used without special handling or precautions.

114. PFAS Products are defective and unreasonably dangerous products for the reasons set forth in paragraphs above.

115. Defendants knew, or reasonably should have known, of the foreseeable risks and defects of PFAS Products. Defendants nonetheless failed to provide adequate warnings of the known and foreseeable risks of PFAS Products, including contamination of properties and water supplies with PFOA and PFOS. And Defendants failed to provide adequate instructions regarding the use and disposal of its PFAS products to prevent contamination of properties and water supplies with PFOA and PFOS.

116. The harm posed by Defendants' PFAS products could have been reduced or avoided by the provision of reasonable instructions or warnings by Defendants to its customers and the omission of the instructions or warnings rendered their PFAS Products not reasonably safe.

117. Defendants knew, or reasonably should have known, that its customers would use and dispose of PFAS products in a way that could lead to contamination of water supplies.

118. Defendants knew, or reasonably should have known, that its PFAS products could contaminate water supplies like Plaintiffs'. At no point did 3M or BASF warn Plaintiffs.

119. Defendants' PFAS Products were used in a manner in which they were foreseeably intended to be used, and as a proximate result of Defendants' failure to warn of the risks of PFAS Products, PFAS compounds, including PFOA and PFOS, contaminate and threatens Plaintiffs' properties, causing Plaintiffs to sustain the injuries and damages set forth in this Complaint.

120. As a direct and proximate result of defendants' acts and omissions as alleged in this Complaint:

a. Plaintiffs' water supplies were and continue to be contaminated with PFAS, including PFOA and PFOS;

b. Plaintiffs were exposed to hazardous chemical substances through their ordinary use of contaminated water for drinking, cooking, bathing, and cleaning;

c. Plaintiffs' properties were and continue to be contaminated such that they have incurred, are incurring, and will incur, substantial costs for investigation, remediation, cleanup, restoration, removal, treatment, and monitoring.

d. Additionally, Plaintiffs may be forced to incur substantial costs to connect their homes to a municipal water supply, in which case they would face monthly charges and bills for water use;

121. As a further direct and proximate result of the acts and omissions of Defendants as alleged in this Complaint, Plaintiffs have sustained and will sustain other substantial expenses and damages, in an amount within the jurisdictional limits of this Court, for which defendants are strictly, jointly and severally liable.

122. The injuries to Plaintiffs caused and/or threatened by defendants' acts and omissions as alleged in this Complaint are indivisible.

123. Defendants knew that it was substantially certain that the acts and omissions described above would threaten public health and cause extensive contamination of property and drinking water supplies. Defendants committed each of the above described acts and omissions maliciously, fraudulently, willfully and/or wantonly, with conscious disregard for probable injury, or with gross negligence or oppressiveness. Such conduct was not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing.

124. Defendants' conduct is reprehensible, despicable, and was performed to promote sales of PFAS Products in conscious and/or reckless disregard of the known risks of injury to health and property. Defendants acted with conscious, willful, and wanton disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon Plaintiffs. Therefore, Plaintiffs request an award of exemplary and punitive damages in an amount reasonable, appropriate, and sufficient to punish these Defendants and deter them from ever committing the same or similar acts.

## VIII. THIRD CAUSE OF ACTION
**Class and Individual Claims for Negligence Resulting in Property Damage**
**(ALL DEFENDANTS)**

125. Plaintiffs, on behalf of themselves and others similarly situated, reallege and reaffirm the allegations set forth in all preceding paragraphs.

126. Defendants had a duty to exercise due care in the design, manufacture, formulation, handling, control, disposal, promotion, marketing, distribution, sale, testing, labeling, use, provision of product information, and instructions for use of PFAS Products and PFAS-containing byproducts and waste.

127. It was reasonably foreseeable in the exercise of reasonable, ordinary care, to ascertain that applying PFAS-containing byproducts and waste, including sludge, to the sandy soil conditions that exist in the Wisconsin region east of Rhinelander and in and around Stella and Stark would necessarily result in contamination of regional groundwater, including private drinking water wells of the Plaintiffs.

128. Defendants so negligently, carelessly, and recklessly designed, manufactured, formulated, handled, labeled, provided product information and/or instructions for use of, controlled (or failed to control), tested (or failed to test), marketed, promoted, sold, supplied, used, and/or disposed of PFAS Products and/or PFAS-containing waste that they breached their duties and directly and proximately caused PFAS to contaminate Plaintiffs' properties and threaten Plaintiffs' health, resulting in the damages alleged in this Complaint.

129. Defendants failed to conduct reasonable, appropriate or adequate scientific studies to evaluate the environmental fate and transport characteristics of PFAS Products, PFAS-waste, and PFAS compounds, including the likelihood that use and disposal of PFAS Products and PFAS waste would cause PFOA, PFOS, and other PFAS to contaminate properties and water supplies,

render drinking water unusable and unsafe, and threaten public health and welfare and the environment.

130. 3M and BASF manufactured, promoted, marketed, supplied and/or otherwise placed into the stream of commerce PFAS Products when it knew, or reasonably should have known, that: (a) commercial customers would use PFAS Products without understanding of their properties, (b) such customers would handle, store, use, or dispose of PFAS Products or waste containing PFAS; (c) such use and/or misuse would release PFAS compounds including PFOA and PFOS into the environment; and (d) when released into the environment, PFOA and PFOS would migrate into water, resist biodegradation, contaminate groundwater, including drinking water supplies, and, ultimately, be difficult and costly to find and remove from the water.

131. 3M and BASF sold PFAS Products to the Rhinelander Paper Mill when it knew, or reasonably should have known, that: (a) use of such products would release PFOA and PFOS; (b) Ahlstrom and/or Wausau Paper, and its predecessors disposed of PFAS-laden waste sludge from the Rhinelander Paper Mill by spreading it onto farmland; (c) when waste sludge is applied to farmland, PFAS, including PFOA and PFOS would migrate into soils and waters, resist biodegradation, contaminate groundwater, including drinking water supplies, and, ultimately, be difficult and costly to remove from the water; and (d) contaminate the farms and nearby properties, causing human exposure and resulting health risks.

132. Ahlstrom and/or Wausau Paper intentionally and unreasonably disposed of PFAS-laden waste sludge from its Rhinelander Plant by spreading it onto nearby farmland when it knew, or reasonably should have known, that such application would contaminate those farmlands with PFAS, including PFOA and PFOS, contaminate groundwater and private drinking water supplies

with PFAS, and expose humans to PFAS. In the alternative, 3M and BASF willfully and intentionally withheld information from Ahlstrom and/or Wausau Paper material to Ahlstrom and/or Wausau Paper's decision to dispose of PFAS-laden waste sludge from its Rhinelander Plant by spreading it onto nearby farmland.

133. Neither 3M, BASF, Ahlstrom, nor Wausau Paper provided any warnings regarding the potential for property and water contamination with PFAS, including PFOA and PFOS. Nor did 3M, BASF Ahlstrom or Wausau take any precautionary measures to prevent or mitigate such contamination.

134. In light of the facts alleged in this Complaint, Defendants, and each of them, breached their duty to use due care in the design, manufacture, formulation, handling, control, marketing, promotion, distribution, sale, testing, labeling, use, disposal, and provision of product information and/or instructions for use of PFAS Products and/or PFAS waste streams generated by the use of PFAS Products.

135. As a direct and proximate result of defendants' acts and omissions as alleged in this Complaint:

a. Plaintiffs' water supplies were and continue to be contaminated with PFAS compounds, including PFOA and PFOS;

b. Plaintiffs were exposed to hazardous chemical substances through their ordinary use of contaminated water for drinking, cooking, bathing, and cleaning;

c. Plaintiffs' properties were and continue to be contaminated such that they have incurred, are incurring, and will incur, substantial costs for

investigation, remediation, cleanup, restoration, removal, treatment, and monitoring;

d. Additionally, Plaintiffs may have to be forced to incur substantial costs to connect their homes to a municipal water supply, in which case they would face monthly charges and bills for water use;

136. As a further direct and proximate result of the acts and omissions of the Defendants alleged in this Complaint, Plaintiffs have sustained and will sustain other substantial expenses and damages, in an amount within the jurisdictional limits of this Court, for which defendants are strictly, jointly and severally liable.

137. The injuries to Plaintiffs caused and/or threatened by defendants' acts and omissions as alleged in this Complaint are indivisible.

138. Defendants knew that it was substantially certain that the acts and omissions described above would threaten public health and cause extensive contamination of property and drinking water supplies. Defendants committed each of the above described acts and omissions maliciously, fraudulently, willfully and/or wantonly, with conscious disregard for probable injury, or with gross negligence or oppressiveness. Such conduct was not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing.

139. Defendants' conduct is reprehensible, despicable, and was performed to promote sales of PFAS Products, and the disposal of waste streams from use of those products, in conscious and/or reckless disregard of the known risks of injury to health and property. Defendants acted with conscious, willful, and wanton disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon Plaintiffs. Therefore, Plaintiffs request an award of

exemplary and punitive damages in an amount reasonable, appropriate, and sufficient to punish these Defendants and deter them from ever committing the same or similar acts.

## IX. FOURTH CAUSE OF ACTION
**Class and Individual Claims for Private Nuisance**
**(All Defendants)**

140. Plaintiffs, on behalf of themselves and others similarly situated, reallege and reaffirm the allegations set forth in all preceding paragraphs.

141. Plaintiffs' properties and wells have been and remain contaminated by PFAS, including PFOA and PFOS, as a direct and proximate result of the intentional and unreasonable, negligent and reckless conduct of Defendants, all as alleged in this Complaint. Such contamination is a substantial and unreasonable interference with Plaintiffs' use of property, land, water, and wells.

142. As a direct and proximate result of defendants' acts and omissions as alleged in this Complaint:

a. Plaintiffs' water supplies were and continue to be contaminated with PFAS, including PFOA and PFOS;

b. Plaintiffs were exposed to hazardous chemical substances through their ordinary use of contaminated water for drinking, cooking, bathing, and cleaning;

c. Plaintiffs' properties were and continue to be contaminated such that they have incurred, are incurring, and will incur, substantial costs for investigation, remediation, cleanup, restoration, removal, treatment, and monitoring.

d. Plaintiffs have lost considerable use and enjoyment of their property. Plaintiffs cannot garden, drink water from their tap, bathe or recreate in water without fear, cook with water from their tap, provide water to their pets and domesticated animals, among other things.

143. As a further direct and proximate result of the acts and omissions of the defendants alleged in this Complaint, Plaintiffs have sustained and will sustain other substantial expenses and damages, in an amount within the jurisdictional limits of this Court, for which defendants are strictly, jointly and severally liable.

144. The injuries to Plaintiffs caused and/or threatened by defendants' acts and omissions as alleged in this Complaint are indivisible.

145. Defendants knew that it was substantially certain that the acts and omissions described above would threaten public health and cause extensive contamination of property and drinking water supplies. Defendants committed each of the above described acts and omissions maliciously, fraudulently, willfully and/or wantonly, with conscious disregard for probable injury, or with gross negligence or oppressiveness. Such conduct was not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing.

146. Defendants' conduct is reprehensible, despicable, and was performed to promote sales of PFAS Products in conscious and/or reckless disregard of the known risks of injury to health and property. Defendants acted with conscious, willful, and wanton disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon Plaintiffs. Therefore, Plaintiffs request an award of exemplary and punitive damages in an amount

reasonable, appropriate, and sufficient to punish these Defendants and deter them from ever committing the same or similar acts.

## X. FIFTH CAUSE OF ACTION
**Class and Individual Claims for Trespass**
**(All Defendants)**

147. Plaintiffs, on behalf of themselves and others similarly situated, reallege and reaffirm the allegations set forth in all preceding paragraphs.

148. Defendants, their agents and employees, knew, or in the exercise of reasonable care should have known, among other things, that: (a) PFAS Products and PFAS compounds are extremely hazardous to property, groundwater, and private water wells; (b) PFAS compounds including PFOA and PFOS would readily escape from PFAS Products and PFAS-containing byproducts and waste whenever those products are used, handled, stored, or disposed of (including through disposal of PFAS-waste on farmland); (c) once released into the environment, PFOA and PFOS would migrate readily into groundwater and would contaminate drinking water sources and wells.

149. Defendants so negligently, recklessly and/or intentionally released, spilled, and/or failed to properly control, handle, store, contain, and use PFAS Products and PFAS containing byproducts and waste, and/or clean-up spills and leaks of PFAS Products and PFAS containing byproducts and waste, and/or improperly disposed of waste sludges from use of PFAS Products and byproducts, that they directly and proximately caused and continue to cause PFAS compounds including PFOA and PFOS to intrude into and contaminate Plaintiffs' properties, water supplies, and wells. Such an intrusion constitutes a trespass.

150. As a direct and proximate result of defendants' acts and omissions as alleged in this Complaint:

a. Plaintiffs' water supplies were and continue to be contaminated with PFAS, including PFOA and PFOS;

b. Plaintiffs were exposed to hazardous chemical substances through their ordinary use of contaminated water for drinking, cooking, bathing, and cleaning;

c. Plaintiffs' properties were and continue to be contaminated such that they have incurred, are incurring, and will incur, substantial costs for investigation, remediation, cleanup, restoration, removal, treatment, and monitoring.

151. As a further direct and proximate result of the acts and omissions of the defendants alleged in this Complaint, Plaintiffs have sustained and will sustain other substantial expenses and damages, in an amount within the jurisdictional limits of this Court, for which defendants are strictly, jointly and severally liable.

152. The injuries to Plaintiffs caused and/or threatened by defendants' acts and omissions as alleged in this Complaint are indivisible.

153. Defendants knew that it was substantially certain that the acts and omissions described above would threaten public health and cause extensive contamination of property and drinking water supplies. Defendants committed each of the above-described acts and omissions maliciously, fraudulently, willfully and/or wantonly, with conscious disregard for probable injury,

or with gross negligence or oppressiveness. Such conduct was not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing.

154. Defendants' conduct is reprehensible, despicable, and was performed to promote sales of PFAS-containing Products and disposal of their byproducts and waste in conscious and/or reckless disregard of the known risks of injury to health and property. Defendants acted with conscious, willful, and wanton disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon Plaintiffs. Therefore, Plaintiffs request an award of exemplary and punitive damages in an amount reasonable, appropriate, and sufficient to punish these Defendants and deter them from ever committing the same or similar acts.

## XI. SIXTH CAUSE OF ACTION
**Class and Individual Claims for Strict Liability – Abnormally Dangerous**
**(**Ahlstrom and Wausau Paper Defendants– Paper Mill Defendants**)**

155. Plaintiffs, on behalf of themselves and others similarly situated, reallege and reaffirm the allegations set forth in all preceding paragraphs.

156. The dangers and hazards of PFAS Products and PFAS are well documented: (a) Land application of PFAS-containing products, byproducts and waste is extremely hazardous and present a high degree of risk to property, groundwater, private water wells, and the health of those served by private water wells near the site of land application; (b) PFAS compounds – including PFOA and PFOS – readily escape from PFAS Products and PFAS-containing byproducts and waste whenever disposed of on farmland through land application; and (c) once released into the environment, PFOA and PFOS migrate readily into groundwater and would contaminate drinking water sources and wells.

157. Ahlstrom and/or Wausau Paper disposed of PFAS through land application, which presented extraordinary risks to the environment due to their persistence, bioaccumulate properties, toxicity and ability to move in their environment. There are alternative products and methods, which do not contain or use hazardous chemicals like PFOA and PFOS or other PFAS forever chemicals, that defendants could have used as alternatives at the Rhinelander Paper mill. Accordingly, the risks of use grossly exceed their utility. 3M phased out the production of PFOS in approximately 2002 and will exit all PFAS manufacturing by the end of 2025: Additionally, 3M will discontinue manufacturing all fluoropolymers, fluorinated fluids, and PFAS-based additive products. Ahlstrom plans to completely phase out PFAS use by the end of 2023. As of November 2016, long-chain PFAS are no longer used in food contact applications sold in the United States. Although the historical operators of the Rhinelander paper mill considered alternatives to PFAS forever chemicals, they did not cease using PFAS chemicals due to financial considerations. Ahlstrom announced that it was phasing out the use of PFAS in its products in 2023.

158. Land application of PFAS (including through disposal of PFAS- containing byproducts and waste on farmland) was inappropriate for any location where there was a potential pathway to groundwater that could be used for domestic purposes, such as existed near the Plaintiffs' properties. The use of PFAS- containing products, byproducts and waste near water resources creates an expectancy that PFAS will enter the groundwater and accumulate and pollute the groundwater with PFAS.

159. The risks of land application of PFAS (including through disposal of PFAS-containing byproducts and waste on farmland) cannot be acceptably mitigated or eliminated where there is a potential pathway of PFAS to groundwater, such as existed near the Plaintiff's properties.

160. Spreading solids and waste containing high levels of PFOA, PFOS, and other PFAS on farmland near residential drinking water sources is not a common practice, and is not in common usage.

161. As a direct and proximate result of defendants' acts and omissions as alleged in this Complaint:

a. Plaintiffs’ water supplies were and continue to be contaminated with PFAS, including PFOA and PFOS;
b. Plaintiffs were exposed to hazardous chemical substances through their ordinary use of contaminated water for drinking, cooking, bathing, and cleaning;
c. Plaintiffs’ properties were and continue to be contaminated such that they have incurred, are incurring, and will incur, substantial costs for investigation, remediation, cleanup, restoration, removal, treatment, and monitoring.

162. As a further direct and proximate result of the acts and omissions of the Defendants alleged in this Complaint, Plaintiffs have sustained and will sustain other substantial expenses and damages, in an amount within the jurisdictional limits of this Court, for which defendants are strictly, jointly and severally liable.

163. The injuries to Plaintiffs caused and/or threatened by defendants' acts and omissions as alleged in this Complaint are indivisible.

164. Defendants knew that it was substantially certain that the acts and omissions described above would threaten public health and cause extensive contamination of property and

drinking water supplies. Defendants committed each of the above-described acts and omissions maliciously, fraudulently, willfully and/or wantonly, with conscious disregard for probable injury, or with gross negligence or oppressiveness. Such conduct was not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing.

165. Defendants' conduct is reprehensible, despicable, and was performed to promote sales of PFAS-containing Products, and disposal of PFAS-containing byproducts and waste, in conscious and/or reckless disregard of the known risks of injury to health and property. Defendants acted with conscious, willful, and wanton disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon Plaintiffs. Therefore, Plaintiffs request an award of exemplary and punitive damages in an amount reasonable, appropriate, and sufficient to punish these Defendants and deter them from ever committing the same or similar acts.

## XXI. SEVENTH CAUSE OF ACTION
**Sludge Application Subclass Claim for Unjust Enrichment**
(Ahlstrom and Wausau Paper Defendants- Paper Mill Defendants)

166. Plaintiff Jerome Kuczmarski on behalf of himself and others similarly situated, reallege and reaffirm the allegations set forth in all preceding paragraphs.

167. Plaintiff Jerome Kuczmarski and other class member allowed Paper Mill Defendants to allow land spreading of paper mill sludge on farmland.

168. The Paper Mill Defendants represented that the sludge would act as a fertilizer for crops and was not harmful.

169. The Paper Mill Defendants paid Plaintiff Jerome Kuczmarski and other Subclass members to accept and spread the sludge on their farmland on a regular, periodic basis.

170. This contractual arrangement benefitted the Paper Mill Defendants who would otherwise be forced to use another, more expensive disposal method, specifically, disposal of the sludge in a landfill.

171. The Paper Mill Defendants never disclosed that, in fact, the sludge contained chemicals used to create grease-proof properties in their paper products, or that such chemicals included PFAS chemicals.

172. Subclass members are now left with farmland and groundwater containing PFAS chemicals.

173. The cost to Subclass members to remove or abate the PFAS contamination from the farmland and current or potential groundwater wells far exceeds the payment received for land spreading from the Paper Mill Defendants. Under this circumstance, the benefit received by the Paper Mill Defendants is inequitable, and Subclass members seek disgorgement and/or other such injunctive and equitable relief as the Court deems just and proper.

## XXII. INDIVIDUAL CLAIMS For Negligence Resulting in Personal Injury Damage (ALL DEFENDANTS)

174. Plaintiffs Carrie Brenton, Kerry Brenton, Don Endres, Diane Pilat, Lucinda Marquardt, James Szymanski, Cindy Deere, Amy Rosendahl, and Frank Rosendahl reallege and reaffirm the allegations set forth in preceding paragraphs 1 through 9, 18, 21, 30, 31 and 38 through 78.

175. Defendants had a duty to exercise due care in the handling, control, and disposal, of PFAS Products and PFAS-containing byproducts and waste.

176. It was reasonably foreseeable in the exercise of reasonable, ordinary care, to ascertain that applying PFAS-containing byproducts and waste, including sludge, to the sandy soil conditions that exist in the Wisconsin region in and around Rhinelander, Stell and Stark would necessarily result in contamination of regional groundwater, including private drinking water wells of the Plaintiffs.

177. Defendants so negligently, carelessly, and recklessly, handled, controlled (or failed to control), tested (or failed to test), and/or disposed of PFAS Products and/or PFAS-containing byproducts and waste, including sludge, that they breached their duties and directly and proximately caused PFAS to contaminate Plaintiffs' well water that was unwittingly consumed by Plaintiffs for a substantial period of time.

178. Defendants failed to conduct reasonable, appropriate or adequate scientific studies to evaluate the environmental fate and transport characteristics of PFAS Products, PFAS-containing byproducts and waste, including the likelihood that use and disposal of PFAS Products and PFAS-containing byproducts and waste, including sludge, would cause PFOA, PFOS, and other PFAS to contaminate properties and water supplies, render drinking water unusable and unsafe, and threaten public health and welfare and the environment.

179. 3M and BASF manufactured, promoted, marketed, supplied and/or otherwise placed into the stream of commerce PFAS Products when it knew, or reasonably should have known, that: (a) commercial customers would use PFAS Products without understanding of their properties, (b) such customers would handle, store, use, or dispose of PFAS Products or waste containing PFAS; (c) such use and/or misuse would release PFAS compounds including PFOA and PFOS into the environment; and (d) when released into the environment, PFOA and PFOS

would migrate into water, resist biodegradation, contaminate groundwater, including drinking water supplies, and, ultimately, be difficult and costly to find and remove from the water.

180. 3M and BASF sold PFAS Products to the Rhinelander Paper Mill when it knew, or reasonably should have known, that: (a) use of such products would release PFOA and PFOS; (b) Ahlstrom and/or Wausau Paper, and its predecessors would dispose of PFAS-laden waste sludge from the Rhinelander Paper Mill by spreading it onto farmland; (c) and that when waste sludge is applied to farmland, PFAS, including PFOA and PFOS would migrate into soils and waters, resist biodegradation, contaminate groundwater, including drinking water supplies, and, ultimately, be difficult and costly to remove from the water; and (d) contaminate the farms and nearby properties, causing human exposure and resulting health risks.

181. Ahlstrom and/or Wausau Paper intentionally and unreasonably disposed of PFAS-laden waste sludge from its Rhinelander Plant by spreading it onto nearby farmland when it knew, or reasonably should have known, that such application would contaminate those farmlands with PFAS, including PFOA and PFOS, contaminate groundwater and private drinking water supplies with PFAS, and expose humans to PFAS. In the alternative, 3M and/or BASF willfully and intentionally withheld information from Ahlstrom and/or Wausau Paper material to Ahlstrom and/or Wausau Paper's decision to dispose of PFAS-laden waste sludge from its Rhinelander Plant by spreading it onto nearby farmland.

182. Neither 3M, BASF, Ahlstrom, nor Wausau Paper provided any warnings regarding the potential for property and water contamination with PFAS, including PFOA and PFOS. Nor did 3M, BASF, Ahlstrom or Wausau take any precautionary measures to prevent or mitigate such contamination.

183. In light of the facts alleged in this Complaint, Defendants, and each of them, breached their duty to use due care in the design, manufacture, formulation, handling, control, marketing, promotion, distribution, sale, testing, labeling, use, disposal, and provision of product information and/or instructions for use of PFAS Products and/or PFAS waste streams generated by the use of PFAS Products.

184. As a direct and proximate result of defendants' acts and omissions as alleged in this Complaint:

a. Plaintiffs Carrie and Kerry Brenton have consumed household water from their residential well that was found to contain high levels of Defendants' PFAS chemicals. Exposure to Defendants' PFAS has caused or was a substantial factor in causing high cholesterol for both Carrie and Kerry Brenton. They have incurred and will incur, costs and expenses related to their injuries, and they seek medical monitoring.

b. Plaintiff Don Endres has consumed household water from his residential well that was found to contain high levels of Defendants' PFAS chemicals. Exposure to Defendants' PFAS has caused or was a substantial factor in causing thyroid disease in Plaintiff Don Endres. Mr. Endres has incurred, and will incur, costs and expenses related to his injuries, and seeks medical monitoring.

c. Plaintiff Diane Pilat has consumed household water from her residential well that was found to contain high levels of Defendants' PFAS chemicals. Exposure to Defendants' PFAS has caused or was a substantial factor in

causing kidney disease in Diane Pilat. Ms. Pilat has incurred, and will incur, costs and expenses related to her injuries, and seeks medical monitoring. Ms. Pilat's injuries have had a substantial impact on her quality of life.

d. Plaintiff Lucinda Marquardt has consumed household water from her residential well that was found to contain high levels of Defendants' PFAS chemicals. Exposure to Defendants' PFAS caused or was a substantial factor in causing kidney cancer in Lucinda Marquardt. Ms. Marquardt has incurred, and will incur, costs and expenses related to her injuries, and seeks medical monitoring.

e. James Szymanski has consumed household water from his residential well that was found to contain high levels of Defendants' PFAS chemicals. Exposure to Defendants' PFAS has caused or was a substantial factor in causing high cholesterol for Mr. Szymanski. He has incurred and will incur, costs and expenses related to his injuries, and seeks medical monitoring.

f. Tammie Szymanski has consumed household water from his residential well that was found to contain high levels of Defendants' PFAS chemicals. Exposure to Defendants' PFAS has caused or was a substantial factor in causing high cholesterol for Ms. Szymanski. She has incurred and will incur, costs and expenses related to his injuries, and seeks medical monitoring.

g. Cindy Deere has consumed household water from her residential well that was found to contain high levels of Defendants' PFAS chemicals. Exposure to Defendants' PFAS has caused or was a substantial factor in causing high cholesterol for Ms. Deere. She has incurred and will incur, costs and expenses related to her injuries, and seeks medical monitoring.

h. Amy and Frank Rosendahl have consumed household water from their residential well that was found to contain high levels of Defendants' PFAS chemicals. Exposure to Defendants' PFAS has caused or was a substantial factor in causing high cholesterol for Mr. and Mrs. Rosendahl. They have incurred, and will incur, costs and expenses relating to their injuries, and seeks medical monitoring.

185. As a further direct and proximate result of the acts and omissions of the Defendants alleged in this Complaint, Plaintiffs Carrie and Kerry Brenton, Don Endres, Diane Pilat, Lucinda Marquardt, James Szymanski, Cindy Deere, Amy Rosendahl, and Frank Rosendahl have sustained and will sustain other substantial expenses and damages, in an amount within the jurisdictional limits of this Court, for which defendants are strictly, jointly and severally liable.

186. The injuries to Plaintiffs caused and/or threatened by Defendants' acts and omissions as alleged in this Complaint are indivisible.

187. Defendants knew that it was substantially certain that the acts and omissions described above would cause extensive contamination of drinking water supplies, including the private wells that members of the community exclusively rely upon for their household water use, including Plaintiffs. Defendants committed each of the above-described acts and omissions

maliciously, fraudulently, willfully and/or wantonly, with conscious disregard for probable injury, or with gross negligence or oppressiveness. Such conduct was not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing.

188. Defendants' conduct is reprehensible, despicable, and was performed to promote sales of PFAS Products, and PFAS-containing byproducts and waste, in conscious and/or reckless disregard of the known risks of injury to health. Defendants acted with conscious, willful, and wanton disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon Plaintiffs. Therefore, Plaintiffs request an award of exemplary and punitive damages in an amount reasonable, appropriate, and sufficient to punish these Defendants and deter them from ever committing the same or similar acts.

## PRAYER FOR RELIEF

Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court grant Plaintiff and each Class Member the following relief against Defendants, jointly and severally, as follows:

a. Certify the Subclasses as requested;

b. Appoint Plaintiffs to serve as the Class Representatives;

c. Appoint Scott Summy, Brett Land, Philip F. Cossich, Jr. and Andrew Cvitanovic as Lead Class Counsel;

d. Enter judgment for Plaintiffs and against Defendants for compensatory and punitive damages, all costs and expenses of suit, and pre- and post-judgment interest;

e. Order such injunctive and equitable relief as necessary to abate the nuisance

caused by Defendants and to prevent continuing injury and damages to Plaintiffs;

f. Order any further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury.

Dated: April 15, 2025

/s/ Andrew J. Cvitanovic
**COSSICH, SUMICH, PARSIOLA & TAYLOR, LLC**
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Telephone: (504) 394-9000
Fax: (504) 394-9110
Philip F. Cossich, Jr. (LA Bar 1788)(PHV)
Andrew Cvitanovic (LA Bar 345000(PHV)
Louise R. Caro (Fla. Bar 633380 (PHV *pending*)

**BARON & BUDD, P.C.**
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219-4281
Telephone: (214) 521-3605
Fax: (214) 520-1181
Scott Summy (TX Bar 19507500)(PHV)
Brett Land (TX Bar 24092664)(PHV)

**CROOKS LAW FIRM S.C.**
Kristen E. Lonergan (WI Bar 1077538)
531 Washington Street
Wausau, Wisconsin 54403
Telephone: (715) 842-2291
Fax: (715) 845-7367

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 15, 2025 by electronically filing the foregoing document with the Clerk of Court through the CM/ECF system, a true and correct copy of the foregoing was served to all known counsel of record by notice of electronic filing.

/s/ Andrew J. Cvitanovic